1    A.    I was to look at payments and receipts from

2  the perspective of creditors of Inacom rather than

3  Inacom itself.

4    Q.    And did you identify which specific creditors

5  you were looking for?                                    01:18

6    A.    I'm sorry?

7    Q.    What specific creditors were you looking at?

8    A.    That was part of my engagement, was to pick

9  creditors.

10    Q.    You got to pick the creditors you would look   01:18

11  at?

12    A.    I was really doing an industry survey.

13    Q.    And is the industry -- when you say "industry

14  survey," is that related to any specific creditor?

15               MR. FORTE:    Objection to form.           01:18

16    Q.    (BY MS. STREUSAND)    Is it related to any

17  specific creditor?

18    A.    It may or may not be, but I was really

19  concerned about the industry rather than any

20  particular creditor of Inacom.    If they were          01:18

21  creditors, so be it.

22    Q.    Well, how did you define your industry?

23    A.    Based upon the people that Inacom bought or

24  sold from.    To or from.

25    Q.    But you didn't look at the particular           01:19

46

```
 1  industry of a particular Defendant, correct?
 2      A.   Correct.  Well, ask the question again
 3  because I want to answer it specifically.
 4      Q.   Sure.  Did you look at a particular
 5  Defendant's industry when you were looking at the      01:19
 6  industry standard?
 7      A.   I looked at the industry standard, which may
 8  or may not have included a Defendant of the case, not
 9  vice versa.  So in other words, I didn't look at a
10  Defendant first to find out what industry it was in.   01:19
11  I looked at the industry that may have had a Defendant
12  in it.
13      Q.   Well, okay.  When you started out looking
14  at -- and I assume -- did Mr. Caine identify for you
15  what industry to look at?                              01:19
16      A.   There was more than one industry.
17      Q.   I understand that.  Who gave you the
18  definition of what industry to look at?  How did you
19  determine that?
20            MR. CAINE:  Objection, no foundation.        01:19
21  Form of the question.
22            MR. FORTE:  Join.
23      Q.   (BY MS. STREUSAND)  Can you answer the
24  question, sir?
25      A.   It really was a joint effort of me doing some  01:20
```

1  investigation as to the kind of industries that Inacom

2  was involved in and then making my selection as to the

3  industries I would be looking at.

4      Q.    And you just selected the industries,

5  correct, but did not base it on a particular          01:20

6  Defendant?

7      A.    That's correct.

8      Q.    And have you done this type of analysis

9  before where you're looking at an industry standard

10  for an ordinary course defense?                       01:20

11     A.    I have looked at some industry work with

12  regard to some of the work that I've done on

13  bankruptcy clients, but I never have put out a report

14  like this before.

15     Q.    This is the first time?                       01:20

16     A.    Correct.  This specific report, right.

17     Q.    Right.  But in terms of analyzing an entire

18  industry, is this the first time you've also done this

19  for a client?

20             MR. FORTE:   Objection to form.             01:20

21     A.    I don't think I analyzed an entire industry.

22  I took a piece of an industry.

23     Q.    (BY MS. STREUSAND)   Okay.  In terms of taking

24  a piece of an industry and analyzing it for a

25  preference defense, is this the first time you've done  01:21

```
 1  it?
 2      A.    In this formality, yes, that I issued the
 3  report in.
 4      Q.    Well, have you done this specific type of
 5  analysis before?  Have you been called upon as an          01:21
 6  expert to do this type of analysis?
 7      A.    I was never called upon as an expert to do
 8  this type of analysis before.
 9      Q.    Okay.  Do you have a retention letter with
10  either Mr. Caine -- well, who retained you, sir?           01:21
11      A.    Mr. Caine.
12      Q.    Mr. Caine did?
13            Do you have a retention letter with
14  Mr. Caine?
15      A.    Yes, I do.                                       01:21
16      Q.    Do you have it here with you today?
17      A.    No, I do not.
18      Q.    Do you know why it wasn't produced to us?
19      A.    I don't know.
20            MS. STREUSAND:  Counsel, will you               01:21
21  forward me a copy of Mr. Gollin's retention letter?
22            MR. CAINE:  Sure.  I'm surprised you
23  didn't get it.
24            MS. STREUSAND:  It's not part of the             01:21
25  package of everything we've gotten here.
```

1  notes?

2     A.    Correct.

3     Q.    Have you ever worked in the -- have you ever

4  worked in or around the computer industry?

5               MR. CAINE:   Objection to the form.                01:28

6     A.    I'd like you to be more specific with that

7  question.

8     Q.    (BY MS. STREUSAND)   Sure.   Sure.

9     A.    I have a client, Inacom, who is in the

10 computer industry.                                              01:28

11    Q.    I understand.   Inacom is a reseller, correct?

12 Or how do you define Inacom's industry?

13    A.    Inacom was in a number of industries.   I

14 outline that in my report.   They were in hardware,

15 software and telecommunications.                               01:28

16    Q.    And is that directly out of something you

17 pulled from one of the documents in your workpapers?

18 It looks like it was pulled from the internet?

19    A.    The 10-K and the --

20    Q.    I think a OneStop report, correct?   There's a       01:28

21 OneSource document?

22    A.    Yes.

23    Q.    And it looks like it's verbatim copied off

24 there?

25    A.    Correct.                                              01:29

```
 1   DIP lender.  They were in the computer industry.
 2        Q.    Boundless?
 3        A.    Boundless.
 4        Q.    What does Boundless sell?
 5        A.    Boundless reformats computers.                  01:30
 6        Q.    Okay.  They recycle computers?
 7        A.    So they're in the computer industry.
 8        Q.    They recycle computers?
 9        A.    Yes.  They reformat them.
10        Q.    All right.  Anything else?                      01:30
11        A.    I mean, most of the work I do there's people
12   there with computers.  They have computers and they
13   work on computers.
14        Q.    I understand, but I'm specifically asking you
15   more an industry question in terms of the computer         01:30
16   industry, manufacturers of computers.
17              I'm looking at your list of industry and
18   case experience, and I didn't see any computer
19   companies on that list or companies that I would
20   consider that manufacture computers.                       01:30
21              MR. CAINE:  Is there a pending question?
22              MR. FORTE:  Yeah.  I was going to say --
23              MS. STREUSAND:  I'm asking him if --
24   he's telling me he's had lots of experience.  I want
25   to understand what experience he has.                      01:30
```

```
 1              MR. CAINE:  What's the question?
 2              MS. STREUSAND:  To identify the
 3   experience he's had looking for manufacturers of
 4   computers.
 5              MR. FORTE:  Manufacturers?              01:31
 6              MS. STREUSAND:  Correct.
 7      A.   The only manufacturer that I worked -- and I
 8   didn't work for them.  I worked for a DIP lender for
 9   Boundless, who was a computer re-manufacturer.
10      Q.   (BY MS. STREUSAND)  A recycler or whatever   01:31
11   you want to call it, correct?
12      A.   Well, they didn't recycle.  A
13   re-manufacturer.
14      Q.   Okay.  What does "re-manufacturer" mean?
15      A.   They took the computer and refit it for    01:31
16   another use, specific use.
17      Q.   And is there anything else?
18              MR. CAINE:  Objection as to form.
19      A.   Not as far as manufacturers, no.
20      Q.   (BY MS. STREUSAND)  Okay.  How about in the  01:31
21   printer industry?
22              MR. FORTE:  Objection to form.
23      A.   Printer or printing?
24      Q.   (BY MS. STREUSAND)  Printer.  Printer.
25      A.   A manufacturer of printers?              01:32
```

```
 1      Q.   Yes.

 2      A.   No.

 3      Q.   Have you worked with Mr. Caine before?

 4      A.   No.

 5      Q.   Have you worked with Pachulski, Stang before,    01:32

 6  which is his law firm?  I'm not trying to be tricky.

 7      A.   I may have in the past, but some of the

 8  people I've worked with have worked with Pachulski,

 9  but I was not directly involved.

10      Q.   How about Mr. Forte?                             01:32

11      A.   I have not worked for Mr. Forte before.

12      Q.   And his law firm, Blank Rome?

13      A.   I've worked with them before.

14      Q.   And what was the nature of that engagement?

15      A.   Bankruptcy work and litigation work.            01:32

16      Q.   Okay.  What type of litigation, sir?

17      A.   I guess their prior firm before they were

18  Blank Rome.

19      Q.   What were they before Blank Rome?

20      A.   I'm sorry?                                       01:33

21      Q.   What were they before Blank Rome?

22      A.   I don't remember the name of the firm.

23              MR. FORTE:  Well, I can -- do you want

24  me to just help out here, Counsel?

25              MS. STREUSAND:  Which case is he talking      01:33
```

1     Q.    Explain that.  Do you mean the industries

2  that Inacom was in or the industries that the

3  creditors of Inacom was in?

4     A.    The creditors.

5     Q.    The creditors of Inacom?                    01:39

6     A.    I think -- I believe that's the next

7  sentence.

8     Q.    Okay.  And do you know why you did it from

9  the creditors' perspective versus the debtor's?

10    A.    That was the engagement I was asked to       01:39

11 perform.

12    Q.    Okay.  Do you know anything beyond that other

13 than what you were asked to do?

14    A.    Do I know anything beyond that?

15    Q.    Did you check anything else to determine      01:39

16 how -- why you were doing it from the creditors'

17 perspective?

18    A.    That was my engagement.

19    Q.    Okay.  Did you look at any cases, any

20 authority on that?                                    01:39

21    A.    No.

22    Q.    And when you defined creditors, did you look

23 at the specific creditors that had raised this defense

24 or did you just look at all the creditors of Inacom?

25              MR. FORTE:  Objection to form.           01:40

1      A.    I believe I answered that before.  I looked

2  at industries that creditors may have been in, but I

3  did not look at specific creditors.

4      Q.    (BY MS. STREUSAND)  Of Inacom?  Of other

5  companies that raised that defense, correct?                    01:40

6      A.    Correct.

7      Q.    And this report is dated as of

8  September 29th, 2005, correct?

9      A.    April 29th.

10     Q.    I'm sorry.  April 29th, 2005.  You're right.           01:40

11 I misspoke.  April 29th of 2005.

12              Is that when it was finalized?

13     A.    Correct.

14     Q.    And are there any supplements to this report?

15     A.    No.                                                    01:40

16     Q.    And was the report actually prepared on that

17 date, on April 29th, 2005?

18     A.    The report has been prepared from the first

19 day I started.  It was finalized on April 29th, 2005.

20     Q.    And are you only testifying with respect to           01:41

21 what I call (c)(2)(C) but the industry standard, sir?

22     A.    Not the industry -- the actual industry

23 performance rather than any standards.

24     Q.    All right.  Are you going to be testifying

25 with respect to the course of conduct of payments               01:41

1  let's say between my client, Dell, and Inacom or are

2  you just testifying with respect to the industry as

3  you define it, however you define it, and Inacom?

4      A.    The industry.  If you look through the

5  report, you saw certain of the interviews that were        01:41

6  made were confidential in nature as to who said what

7  to whom even though there was some companies mentioned

8  in there that may have been spoken to.  It could or

9  could not have included your client, but they didn't

10 match up to the actual interview.                          01:42

11     Q.    Yes.  So that you can't verify who said what

12 in your report, correct, in terms of which party was

13 answering the question?

14     A.    That's correct.  And that was on purpose.

15     Q.    It makes it hard to verify the data, though,    01:42

16 doesn't it?

17          MR. FORTE:   Objection to form.

18     A.    By whom?

19     Q.    (BY MS. STREUSAND)  By anyone who is trying

20 to test it if the information is kept confidential and    01:42

21 you can't tell which company is reporting; there's

22 only a list of companies.

23     A.    That was a prerequisite of getting some of

24 the information; that people would not want their

25 companies mentioned.                                       01:42

1    A.    Uh-huh.

2    Q.    You did not limit your inquiry to computer

3 manufacturers, did you?

4    A.    That's correct.

5    Q.    And you did not take into account the          01:43

6 specific Defendants that were asserting the ordinary

7 course defense to determine which industries you were

8 looking at, correct?

9    A.    I think I -- yes, I did not.  I've answered

10 that question a number of times.                        01:44

11    Q.    Okay.  I just want to make sure I understand.

12    A.    Right.

13    Q.    Do you know why telecommunications is

14 included as part of the markets that you're looking

15 at?                                                     01:44

16    A.    We made this decision early on in the

17 engagement based upon the OneSource document as to the

18 industries we would be in.  There's probably some

19 overlapping involvement of companies in more than one

20 industry.                                               01:44

21    Q.    But the OneSource document you're referring

22 to is in the workpapers, correct?

23    A.    Correct.

24              MS. STREUSAND:  Let's go ahead and mark

25 these 2 and 3, please.                                  01:44

1  used them.

2      Q.   Okay.  But the parameters --

3      A.   The parameters being the companies and the

4  industries that we disclosed.

5      Q.   Okay.  And again, the industries you're          02:14

6  looking at are set forth as computer hardware,

7  computer software and telecommunications hardware and

8  services?

9      A.   Correct.

10      Q.   And was the contact with Moores Rowland made    02:14

11  in 2003?

12      A.   Yes.

13      Q.   Any time after that?

14      A.   Probably not.

15      Q.   Now, in your "Conclusions" -- we're now back    02:15

16  on Page 1, sir, Paragraph 2 -- it says, "Approximately

17  69.7 of account payments are made within the invoice

18  contract terms."

19              Do you see that?

20      A.   Yes.                                            02:15

21      Q.   Do you know what the specific invoice

22  contract terms are?

23              MR. FORTE:  Objection to form.

24      A.   We probably relied upon D&B to tell us that.

25  D&B has specific deliniations as to contract terms,     02:15

```
 1│ 30 days past due, 60 days past due, et cetera.
 2│     Q.   (BY MS. STREUSAND)  Do you know if any of the
 3│ companies had agreements that would, let's say, say
 4│ 30 days but you can pay within 40 -- 45 days or
 5│ 40 days?                                               02:15
 6│              MR. CAINE:  Objection as to form.
 7│     A.   All that information was in the interviews
 8│ that are outlined in here.
 9│     Q.   (BY MS. STREUSAND)  But in terms of when you
10│ say 69.7 of account payments are made within invoice  02:16
11│ contract terms, does that take into account when there
12│ are agreements to let a customer pay beyond contract
13│ terms?
14│              MR. FORTE:  Objection to form.
15│              MR. CAINE:  Objection, no foundation.    02:16
16│     Q.   (BY MS. STREUSAND)  Can you answer the
17│ question?
18│     A.   If D&B came up with that format, then we used
19│ D&B's format.
20│     Q.   Do you know if D&B did any kind of interview  02:16
21│ or any kind of information with respect to finding
22│ that out?
23│              MR. FORTE:  Objection to form.
24│     A.   In our opinion, D&B was a well established
25│ company that produced credit information; and to get   02:16
```

```
 1   on an equal playing field, we used what they
 2   determined was credit terms.
 3        Q.   (BY MS. STREUSAND)  And all the D&B
 4   information that I can tell that you were looking at
 5   for the most part was printed or gathered in 2003,      02:16
 6   correct?
 7        A.   2003, 2004, yes.
 8        Q.   It is from that time period, correct?
 9        A.   Correct.
10        Q.   Did you attempt to find information for 2000?  02:17
11        A.   D&B does not keep their records that way.
12   D&B keeps on updating their records, and they have no
13   prior records available.
14        Q.   So you didn't have anything for 1999 either?
15        A.   No.  As I said, we spoke to D&B, and D&B does  02:17
16   not keep all the records.  You couldn't go to D&B
17   today and go back and ask them for something from
18   2004, 2002, 2000.  That's just not the way they keep
19   their records.
20        Q.   All right.  Did you attempt to find out the   02:17
21   payment histories in 2000?
22        A.   We relied on D&B and the interviews.
23        Q.   So 2003 would be the time period?
24        A.   That's it.
25        Q.   Was Inacom in business in 2003?               02:17
```

1            What about Applied Materials?

2      A.    When we put these together, these were the

3 designations that D&B gave these companies.

4      Q.    All right.  But -- okay.  Did you do anything

5 separate to verify for yourself that these are                02:24

6 computer manufacturing companies?

7      A.    We did not look into the history of each of

8 these companies, no.

9      Q.    Ikon, what do they make?

10     A.    The same answer.                                   02:24

11     Q.    Just that D&B listed them --

12     A.    Correct.

13     Q.    Let me hand you your workpapers, which are

14 in -- well, actually, identify for me what is in

15 Deposition Exhibit No. 2.  I don't want to                   02:25

16 characterize that for you.

17     A.    Just reading from the cover it says

18 "OneSource Report, Various D&B information reports for

19 Inacom" and a docket report.

20     Q.    Okay.  And identify what's in your             02:25

21 Exhibit No. 3, what's been marked as Exhibit No. 3,

22 sir.

23     A.    Again, reading from the front page, "D&B

24 Payment Analysis Reports."

25     Q.    And this is the information you gave your      02:25

1    Q.    Highly recommended by whom?

2    A.    By my firm, who has used them before.

3    Q.    And has your firm done this type of report

4  before?

5    A.    It could be.  I don't know.                    02:41

6    Q.    You don't know?

7    A.    I haven't.

8    Q.    You haven't.

9          I take it from your report -- well, who

10 developed the questions that were asked by Strategic   02:41

11 Consulting & Research?

12   A.    They were done under my supervision.  I

13 generally wrote the questions.

14   Q.    And that's Schedule 4, correct?

15   A.    And spoke to -- I'm sorry.                      02:41

16   Q.    Is that set forth in Schedule 4, sir?

17   A.    Yes.

18   Q.    And were the Schedule 4 questions asked --

19   A.    I'm sorry.  Schedule 5.

20   Q.    Schedule 5.  What's the difference between     02:42

21 Schedule 4 and Schedule 5?

22   A.    They're probably the same questions.  It was

23 just one for the database build-up and one for the

24 questions that Strategic was going to be asking.

25   Q.    They look the same to me.                       02:42

```
 1      A.    What schedule are you on now?

 2      Q.    The same one we were on.

 3      A.    Okay.

 4      Q.    Schedule 6.  And in the first box in parens

 5  it says "FDR."  What does that refer to?                    02:50

 6      A.    From date of receipt I would assume.

 7      Q.    Okay.  If you'd turn to the next page to

 8  "Computer Hardware Payables" where it says, for

 9  example, "45 days," and it says 83 million 132 in

10  revenues.                                                   02:50

11              Do you know which of those companies

12  that box refers to?

13      A.    Again, as I said a number of times, we

14  purposely did not know which companies refer to which

15  lines.                                                      02:51

16      Q.    And what does the "45 days" refer to?

17      A.    45 days.  Standard payment terms of 45 days

18  from date of receipt.

19      Q.    Okay.  Do you know if that's on the invoice

20  or is that something that was agreed to by the             02:51

21  parties?

22      A.    I'm not sure.  That's standard payment terms.

23      Q.    You don't know, though?

24      A.    Correct.

25      Q.    And how about the next one where it says       02:51
```

1     Q.    Okay.  So you really relied on the D&B
2  reports --
3     A.    Correct.
4     Q.    -- than the interviews of Weiser?
5     A.    Right.                                          02:56
6     Q.    Okay.  I'm just trying to understand.
7     A.    Right.
8     Q.    So most of the data you relied on is the D&B
9  reports, correct?
10    A.    Uh-huh.                                         02:56
11    Q.    From 2003?
12    A.    The most current one we used, which was
13  probably 2003, yes.  It could be 2003, 2004, yes.
14    Q.    Okay.
15    A.    Again, we could not get earlier than that      02:56
16  because D&B does not keep their records that way.
17    Q.    Do you believe from your experience that two
18  or three years before there may be different credit
19  and collection practices in the industry?
20    A.    Could possibly be.                             02:57
21    Q.    Do you think the failure of a number of
22  resellers could have caused credit to be tightened
23  after the year 2000?
24            MR. FORTE:  Objection to form.
25            MR. CAINE:  Objection, no foundation.        02:57

```
 1      A.    No, not really.
 2      Q.    Okay.  This is from your report, your
 3   statement:  "The data gathered helped us to better
 4   understand whether businesses in specific markets
 5   differentiate their accounts payable and receivable        03:02
 6   terms by customer based on size, volume, financial
 7   situation, or a combination of these criteria."
 8              Did you come to any understanding, and
 9   what was that understanding?
10      A.    No.                                               03:03
11      Q.    You did not come to any understanding?
12      A.    No.
13      Q.    Okay.
14      A.    I could not and would not draw a statistical
15   conclusion from the interviews that were taken, the        03:03
16   results of the interviews that were taken.
17      Q.    And from all the -- I think it says there
18   were 64 interviews of 89 companies, correct?
19              You did not determine that there was a
20   variation amongst those?                                   03:03
21      A.    Generally speaking, yes.
22      Q.    Did you do any specific searches on resellers
23   of computer products?
24      A.    Just the information that was here.  That's
25   all we did.                                                03:04
```

```
 1               THE WITNESS:  Could we take a break?  I

 2   have to make a phone call.

 3               MS. STREUSAND:  Oh, sure.

 4               (Recess.)

 5       Q.   (BY MS. STREUSAND)  Mr. Gollin, going back to    03:24

 6   your conclusion where it says approximately 69.7 of

 7   accounts payable are made within invoice contract

 8   terms, can you lead me through the math as to how you

 9   arrived at 69.7 percent?

10       A.   If you go to Schedule 3, it was the total of    03:24

11   all three sections.

12       Q.   And that's telecom, computer hardware and

13   computer software companies?

14       A.   That's correct.

15       Q.   And within let's say a group, looking at, for   03:25

16   example, computer hardware companies, did you do

17   anything to weight the responses?

18               For example, you've got a company like

19   Resilien, which is a much smaller company than a

20   company like IBM in terms of the responses.  Did you   03:25

21   weight the responses or are all the responses given

22   equal weight?

23               MR. FORTE:  Objection to form.

24       Q.   (BY MS. STREUSAND)  Do you understand my

25   question?                                               03:25
```

1      A.   Yes.  All equal weight.  We just took an
2  average.

3      Q.   And let's go through it.  The "Total
4  Received" is total dollars received by each company?

5      A.   No.  "Total Received" is the total number of        03:25
6  entries that D&B had for each one of these companies.

7      Q.   Okay.  So is that --

8      A.   Dollars is the next column over.

9      Q.   Okay.  Excuse me.  Where it says "Sprint" and
10 it says "Total Received" and it says "743," tell me        03:26
11 what that number represents.

12     A.   743 -- I'm sorry.

13     Q.   Tell me what that number represents.

14     A.   743 payments totaling $27 million, of which
15 54.8 were within terms; 16.8 were one to 30 slow.  One     03:26
16 to 30 after terms.  Et cetera.

17     Q.   And then slow 5.4, and then slow 91 -- slow
18 61 to 91 past due, correct?

19     A.   Correct.

20     Q.   And this is all from the Dun & Bradstreet         03:26
21 information you gathered, Schedule 3?

22     A.   That's correct.

23     Q.   And you relied on Schedule 3 to come to the
24 conclusions of your report, not the interviews in
25 terms of that 69.7 percent number?                         03:26

```
 1        A.    The report showed me that I can rely; that I
 2   found nothing that said I could not rely on the D&B.
 3   In effect, the interview said D&B is what you have and
 4   that's the best you have.
 5        Q.    And your D&B information includes both          03:27
 6   accounts payable and accounts receivable for each one
 7   of these industries, correct?
 8              MR. CAINE:  Objection, no foundation.
 9        Q.    (BY MS. STREUSAND)  Does the D&B information
10   you pulled include both accounts payable for each of     03:27
11   these industries and accounts receivable?
12        A.    D&B is accounts payable, how they pay.
13        Q.    Okay.  Well, look at Schedule 7 with me.
14   That schedule has payables and receivables on it.  Is
15   that -- is this just from the interviews or is it from   03:28
16   the D&B part of the report?
17        A.    Interviews.
18        Q.    In terms of the Dun & Bradstreet information
19   you pulled, did you pull both payables information for
20   a specific industry or did you just pull the             03:28
21   receivables information?
22        A.    Payables.
23        Q.    Payables?
24        A.    Correct.  I'm sorry.  We had some payable and
25   receivable.                                              03:28
```

127

1    Q.    I was trying to find that page.  Where are
2  you?

3    A.    I'm on Page 19.

4    Q.    Okay.

5    A.    Page 19.  That's an example.  Others of these      03:28
6  are in these reports.

7    Q.    Are in the reports.  And in the reports, I
8  believe that you pulled both payables and receivables?

9    A.    Correct.

10   Q.    Correct?                                           03:29

11   A.    Correct.

12   Q.    And then how did you factor that in when you
13 came to your conclusion of the 69.7?

14   A.    There was a preponderance of information for
15 the payables, and that's the information we used as      03:29
16 far as their payments are concerned.

17   Q.    Let me take you to Deposition Exhibit No. 3,
18 and if you could turn to the Hewlett Packard total D&B
19 files information.  Let me show you what page I'm on
20 so we're both on the same page.                          03:30

21   A.    Give me an idea of where it is.  Is it before
22 or after that (indicating)?

23   Q.    It's after Inacom office solutions.  Ikon
24 Office Solutions.

25   A.    Hewlett Packard.                                  03:30

```
 1      Q.    Yeah, Hewlett Packard.  Exactly.  We're on
 2  the same page.
 3            Okay.  Now, is this the D&B information
 4  that was pulled by your company?
 5      A.    Yes.                                              03:30
 6      Q.    And do you know what the date of this
 7  information is?
 8      A.    Probably 2003, 2004.
 9      Q.    Okay.  And looking at this, does it show
10  46 percent is paid between 61 and 90 days in terms of    03:30
11  receivables being paid?
12      A.    Yes.
13      Q.    And how is this data, Hewlett Packard's data,
14  weighted versus a company like Resilien?
15      A.    We took all the data together.               03:31
16      Q.    And you did not weight it based on the size
17  of the companies reporting?
18      A.    Correct.
19            MR. FORTE:  Objection, asked and
20  answered.                                               03:31
21      Q.    (BY MS. STREUSAND)  Do you think it's
22  appropriate where you've got a company that is
23  supplying hundreds of millions of dollars worth of
24  computers and has a payment history to compare it to a
25  company that sells like about a million dollars worth   03:31
```

```
 1        Q.    Okay.  That's what I'm trying to determine.
 2              Aside from the information you pulled
 3   from D&B, do you have particularized knowledge of the
 4   computer hardware industry aside from the D&B report
 5   that you pulled?                                            03:38
 6        A.    Specifically what?
 7        Q.    In terms of the competitors in the hardware
 8   computer industry.
 9              MR. FORTE:  Objection to form.
10        A.    The knowledge that I used to come up with who   03:38
11   may or may not be Dell's competitors was based upon
12   the listing I got from D&B.
13        Q.    (BY MS. STREUSAND)  And apart from that, do
14   you have any particularized experience with the
15   computer hardware industry?                                03:39
16              MR. CAINE:  Objection as to form.
17              MR. FORTE:  Join.
18        A.    As far as knowing companies in the industry,
19   yes, I know companies in the industry.
20        Q.    (BY MS. STREUSAND)  Do you know their payment   03:39
21   practices and how they get repaid for their invoices,
22   you personally?
23        A.    I got that information from -- by work that I
24   did using the D&B reports.
25        Q.    Okay.  Aside from D&B, sir -- just -- just      03:39
```

1    Q.   And do you have any knowledge with respect to

2  how the computer industry was repaid by what I would

3  call the reseller industry, the industry that resells

4  computers?

5    A.   Not --                                              03:40

6              MR. CAINE:  Objection as to form.

7              MR. FORTE:  Objection to form.

8    A.   Not specifically.

9    Q.   (BY MS. STREUSAND)  Do you have an opinion of

10 whether -- or if Dell is in the telecom industry?        03:41

11             MR. FORTE:  Objection to form.

12   A.   The only information I used was D&B's

13 information.

14   Q.   (BY MS. STREUSAND)  I understand.

15   A.   Whether I have my own personal opinion really   03:41

16 didn't matter in this instance.

17   Q.   But you included the telecom industry as part

18 of your industry standard, correct?

19   A.   Correct.

20   Q.   Is Dell in that business?                        03:41

21   A.   They're not on this listing.

22   Q.   Is Lexmark in that business?

23   A.   They're not on this listing.

24   Q.   But that listing was included as part of your

25 overall percentages in determining the repayment --     03:42

```
 1      Q.   And it discusses the CHS Electronics
 2  bankruptcy.
 3              Do you know what CHS Electronics was as
 4  a company?
 5      A.   No.                                          04:10
 6      Q.   How about MicroAge?
 7      A.   I was not interested in Inacom, the company.
 8  I was just interested in their creditors and how they
 9  collected and how they did business.
10      Q.   Okay.  But do you think that how Inacom had   04:10
11  credit in 2000 may have changed?
12              MR. CAINE:  Objection as to form.
13              MR. FORTE:  Join.
14              MS. STREUSAND:  Let me clarify the
15  question.                                             04:11
16      Q.   (BY MS. STREUSAND)  Are you aware if in the
17  year 2000 certain resellers filed bankruptcy?
18      A.   That had nothing to do with my report.
19      Q.   Okay.  And you don't believe that things that
20  happened in 2000 would not -- would affect the credit  04:11
21  policies in terms of let's say reseller bankruptcies?
22              MR. CAINE:  Objection as to form.
23              MR. FORTE:  Object to form.
24      A.   I mean, possibly, but my concern was getting
25  the latest information and probably the only available  04:11
```

155

```
 1   information on the creditors' payment history with
 2   regard to the creditors of Inacom.
 3       Q.    (BY MS. STREUSAND)  Okay.  But this would be
 4   for years after the creditors of Inacom were being
 5   repaid by Inacom, correct?                                04:11
 6              MR. CAINE:  Objection as to form.
 7       A.    That was the only available information.
 8       Q.    (BY MS. STREUSAND)  Correct.  And that's 2003
 9   information?
10       A.    And the only available information.            04:12
11       Q.    Well, did you talk to any of the collection
12   or credit people at a particular company and ask them
13   for their 2000 data?
14       A.    I did not.
15       Q.    And did anyone under your direction ask for    04:12
16   the 2000 data from the credit and collection
17   departments of let's just say the computer hardware
18   industry?
19       A.    No.
20       Q.    The same question for the computer software    04:12
21   industry?
22       A.    No.  But just like the report that you asked
23   me to critique of LaRocca, he had the same problem
24   apparently.  He did not get information back to 2000.
25   He used the most current information available.          04:12
```

```
 1   contained?
 2        A.    The exhibits are in these two binders.
 3        Q.    In Deposition Exhibit 2 and 3?
 4        A.    Correct.  And in the report.
 5        Q.    Mr. Gollin, let me make sure I understand      04:29
 6   this correctly.
 7              In terms of the type of report that you
 8   prepared as Deposition Exhibit 1, this is the first
 9   time you've done this type of report for industry
10   standards in a preference case?                          04:30
11        A.    Yes.
12              MS. STREUSAND:  Pass the witness.
13                        EXAMINATION
14   BY MR. HERSEY:
15        Q.    Mr. Gollin, I'm Jon Hersey.  Actually, do you 04:30
16   pronounce your name Gollin or Gollin?
17        A.    You're right.  Gollin.
18        Q.    Gollin.  Okay.  My name is Jon Hersey.  I
19   represent Ingram Entertainment.
20              What industry was NCL in?                      04:30
21        A.    I don't see them on here.
22        Q.    I'm sorry.  You don't see them at all in your
23   report?
24        A.    No.
25        Q.    Other than just looking back at your report,  04:31
```

1   Dun & Bradstreet report?

2       A.    Correct.

3       Q.    Okay.  And then at Page 19 of your report,

4   you attach some numbers related to NII Holding.

5                 Is this reformatted from Dun &                04:33

6   Bradstreet or is this an actual copy of what you

7   received from D&B, Page 19?

8       A.    I think that's what we downloaded from D&B.

9       Q.    And the 1,433,200 appears at the -- as the

10  total under the "Dollar Amount," is that correct?        04:33

11      A.    That's correct.

12      Q.    Do you know what -- if you look back at the

13  top of that page where it says "Total in D&B's

14  File" --

15      A.    Which page?                                     04:34

16      Q.    Page 19 still --

17      A.    Yes.

18      Q.    -- at the top.  It says "Total in D&B's File,

19  55 1,449,400."

20      A.    Right.                                          04:34

21      Q.    What's the difference between -- can you

22  explain the difference?

23      A.    $6,000.  I can't explain the difference.

24      Q.    Okay.  But this is something you downloaded

25  from D&B?                                                 04:34

1      A.    Correct.

2      Q.    Now, NII Holding has its receivables broken

3  down into 20 some odd different categories here.  Is

4  that about right?  The first one being "Telephone

5  communications."                                          04:34

6      A.    Right.

7      Q.    Right.  And NII Holding reports $1,267,350 of

8  receivables for the telephone communications industry,

9  is that correct?

10     A.    Correct.                                         04:34

11     Q.    In your report and the figures that you're

12 using on Schedule 3, you used the total amount of

13 receivables for the company even if some of those

14 receivables were not related to the telephone

15 communications industry, is that correct?               04:35

16     A.    Correct.

17     Q.    And you used the same analysis for each of

18 the companies on Schedule 3, correct?

19     A.    Correct.

20     Q.    So if, for instance, IBM, which we looked at   04:35

21 earlier, had a number of receivables not in the

22 computer hardware industry, you still included that in

23 your Schedule 3 total dollar figures, is that correct?

24     A.    Well, if you look at telephone

25 communications, it's probably 90-odd percent of the     04:35