# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | |
| ) | |
| INACOM CORP., *et al.*, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| —————————————————— ) | |
| ) | |
| INACOM CORP., on behalf of all affiliated Debtors, ) | Civil Action No. 04-593 (GMS) |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| INGRAM ENTERTAINMENT INC., as successor ) | |
| in interest to NASHVILLE COMPUTER ) | |
| LIQUIDATORS, L.P., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT INGRAM ENTERTAINMENT INC.'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.   FINDINGS OF FACT

### A.   Parties And Procedural History

1.   Ingram Entertainment Inc. ("Ingram" or "Defendant") is a successor in interest to Nashville Computer Liquidators, L.P. ("NCL").   At all relevant times, NCL was a limited partnership with its principal place of business in Tennessee.   NCL was in the business of reselling refurbished and liquidated computer hardware and peripherals to wholesale distributors. Ingram was a general partner of NCL.

2.      Inacom Corp. ("Inacom") and its affiliated Debtors (collectively "Debtors") filed a Voluntary Petition for Relief Under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date").

3.      On June 16, 2000, the United States Bankruptcy Court for the District of Delaware entered an order procedurally consolidating the Debtors' Chapter 11 cases for administrative purposes only.  Following the Petition Date, the Debtors operated their businesses and managed their properties as Debtors-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On May 20, 2002, Inacom filed its Complaint against Ingram Entertainment.

5.      On June 5, 2002, Ingram Entertainment filed its Answer.

6.      The Bankruptcy Court confirmed the Debtor's Plan on May 23, 2003.

7.      On June 25, 2004, this Court entered an Order withdrawing the reference of this adversary proceeding to the bankruptcy court.

**B.      Debtors' Financial Condition At The Time Of The Alleged Transfers**

8.      The Debtors were originally in two basic lines of business:  computer hardware and peripherals distribution (the "Distribution Business") and a technology service business (the "Service Business").  Through these businesses the Debtors delivered personal computer and related information technology products to businesses and provided various technology-related services, managing the entire technology lifecycle, including technology planning, technology procurement, technology integration, technology support, and technology management.

9.      On April 9, 1999, Inacom entered into a Credit Agreement with various lending institutions ("Credit Agreement").  Deutsche Bank AG New York Branch ("Deutsche Bank") served as the administrative agent.  The Credit Agreement provided a $450,000,000 loan to

Inacom, with such loan being comprised of both a Term Loan Facility and a Revolving Loan Facility.

10.    In late 1999, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for the sale of the Distribution Business to Compaq.  At that time, Compaq was the largest seller of computer products in the United States.  Upon the sale of the Distribution Business to Compaq, Inacom fully intended to continue operating the Service Business, which historically enjoyed higher margins than the Distribution Business, and Compaq had promised to be a major Inacom customer.  Specifically, for the first nine months of 1999, the Service Business had a Gross Margin of approximately 37%; whereas, for that same time period, the Distribution Business had a Gross Margin of approximately only 7%.  Therefore, the sale to Compaq permitted Inacom to focus its business on the high-margin Service Business as opposed to the low-margin Distribution Business.

11.    As a result of these negotiations, on January 4, 2000, Inacom signed an Asset Purchase Agreement (the "APA") and certain related operational agreements with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (referred to collectively as "Compaq").

12.    Under the APA, Compaq agreed to purchase substantially all the assets of Inacom's Distribution Business (the "Compaq Sale").

13.    In connection with the Compaq Sale, Compaq, in addition to the APA, also entered into substantial long-term operational agreements with Inacom worth hundreds of millions of dollars.  Among these related agreements were: (i) a $55.5M credit facility in which Compaq agreed to extend to Inacom a $55.5M loan; (ii) a three year, $420M Services, Supply and Sales Agreement (and a related Service Level Agreement) in which Compaq agreed to utilize Inacom's

services and "assist Inacom in a generation of incremental revenues for Inacom service business" in the aggregate amount of $85M for year 2000, $140M for year 2001, and $195M for year 2002; (iii) a three-year outsourcing/agency agreement in which Compaq agreed to pay Inacom a 3.5% distribution fee for the sale of Compaq computer products; and (iv) a Separation and Sharing Agreement, in which Inacom and Compaq would share certain assets and personnel for up to twelve (12) months following the close of the Compaq Sale.

14.   The terms of a Third Amendment and Waiver to the Credit Agreement, dated January 4, 2000, established a borrowing base requirement to govern advances to Inacom under the Deutsche Bank Credit Facility.  The borrowing base was comprised of 60% of eligible inventory plus 85% of eligible receivables plus 50% of the amount of the Nesbitt Burns Residual Note (a pre-existing debt).  This borrowing base requirement continued under the Fourth Amendment and Waiver.

15.   Inacom subsequently executed a Fourth Amendment and Waiver to the Credit Agreement, amending the Credit Agreement to lower it from a $450M combined credit facility to a $225M revolving credit facility ("Deutsche Bank Credit Facility").  The proceeds of the sale of the Distribution Business to Compaq significantly reduced Inacom's total indebtedness.

16.   The Deutsche Bank Credit Facility contained certain financial covenants, including minimum net worth covenants, covenants requiring certain minimum levels of working capital, and minimum EBITDA covenants, among others.  Under the Deutsche Bank Credit Facility, as stated under the Fourth Amendment and Waiver, the minimum EBITDA covenant required Inacom to have EBITDA of $7,000,000 by December 31, 2000 and $15,000,000 by March 31, 2001.  In addition, the Deutsche Bank Credit Facility set a net worth covenant, which required Inacom to maintain a minimum net worth of $185,000,000, plus 75% of net income, plus 100%

of capital stock net issuance proceeds, plus 100% of any indebtedness converted into equity. Deutsche Bank's own analysis showed that Inacom would be able to comply with the minimum EBITDA and net worth covenants set forth in the Deutsche Bank Credit Facility.

17.    In connection with the APA, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared a solvency opinion, dated February 16, 2000 ("Houlihan Lokey Solvency Opinion"). The Houlihan Lokey Solvency Opinion was a condition precedent to finalization and consummation of the APA by which Inacom assured Compaq that it was purchasing the assets of a financially viable company.  After an extensive review and analysis of Inacom's financial records and the Service Business and after interviews with Inacom's top management, including but not limited to Thomas Fitzpatrick (Inacom's CFO) and Richard Oshlo (Inacom's Treasurer), Houlihan Lokey stated in the Houlihan Lokey Solvency Opinion that: (i) the fair value and present saleable value of Inacom's assets exceeded the company's stated and identified contingent liabilities; (ii) Inacom would be able to pay its debts as they matured; and (iii) the capital remaining in Inacom after the sale of the Distribution Business to Compaq would not be unreasonably small for the continued operation of the Service Business.  The Houlihan Lokey Solvency Opinion was based on an extensive financial and business analysis, and Inacom paid Houlihan Lokey $400,000 for the Solvency Opinion.

18.    Accordingly, Compaq, Inacom, and Deutsche Bank relied upon the Houlihan Lokey Solvency Opinion and believed that it was an accurate assessment of Inacom's financial condition.

19.    Prior to the APA, Goldman Sachs & Co. ("Goldman Sachs") utilized market data and other information in preparing a January 4, 2000 presentation to Inacom's Board of Directors.  Goldman Sachs provided investment and financial advice and services to Inacom for

approximately two years prior to the APA.  During the over two-year relationship between Goldman Sachs and Inacom, Goldman Sachs performed business analysis for Inacom on a variety of topics, including valuation analysis and capital structure analysis.

20.   In preparing the January 4, 2000 presentation to Inacom's Board of Directors, Goldman Sachs undertook an extensive analysis concerning Inacom, including utilizing the information previously known and made available to it over the course of the various projects performed by Goldman Sachs over the two-year prior relationship.  In addition, Goldman Sachs analyzed information from various sources including IBIS estimates[1] (for earnings projections) and information from Wall Street analysts in preparing the January 4, 2000 presentation to Inacom's Board of Directors.

21.   Based on Goldman Sachs' knowledge of Inacom and its extensive analysis, Goldman Sachs prepared projections showing that Inacom would have increasing EBITDA throughout 2000 with a positive EBITDA by the second quarter of 2001.  In preparing this analysis, Goldman Sachs projected future increases in EBITDA and revenues for Inacom, and Goldman Sachs expressed its opinion to the parties that the Service Business of Inacom was viable and would survive as a going concern.

22.   In addition, Deutsche Bank performed a specific analysis concerning Inacom in connection with the Deutsche Bank Credit Facility.  Deutsche Bank, like Goldman Sachs & Co., concluded that Inacom would achieve positive EBITDA in 2001 and that its revenue and EBITDA levels would continue to strengthen throughout 2000.

---

[1]      IBIS is a public market source for forecast information.

23.    Deutsche Bank concluded that Inacom's management had a sound plan and direction for the company and believed that Inacom would continue as a going concern after the Compaq Sale in the future.

24.    Following the Compaq Sale, Inacom, Compaq, Deutsche Bank, and Goldman Sachs, believed and operated with the intention that Inacom would continue as a going concern into the future.

25.    Based on the APA, the related operational agreements discussed above, the Fourth Amendment and Waiver to the Credit Agreement, and the Houlihan Lokey Solvency Opinion, the Compaq Sale closed on February 16, 2000.  Compaq paid approximately $369,500,000 for Inacom's Distribution Business and also assumed some of Inacom's accounts receivable and debt obligations, including but not limited to all of Inacom's previous obligations owed to Deutsche Financial Services in connection with Inacom's floor planning facility for Compaq product.

26.    Inacom's management received bonuses, approved by Inacom's Board of Directors, following the Compaq Sale, including a $625,000 payment, which in part was a bonus and other additional compensation to the CEO, Gerald Gagliardi, and a $100,000 bonus to the CFO, Thomas Fitzpatrick.

27.    After the Compaq Sale, Inacom, through its treasurer, Richard Oshlo, submitted monthly Borrowing Base Certificates to Deutsche Bank in accordance with the Deutsche Bank Credit Facility, providing information concerning the eligible inventory, receivables, and outstanding principal of the Nesbitt Burns Residual Note (an existing note), in order to calculate the funds available to Inacom.

28.    Inacom's Certified Borrowing Base Certificates prove the availability of operating cash to the company at least through April 22, 2000.  Inacom prepared these Certificates for Deutsche Bank.   Under the February 26, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $79,322,298.40.  In the March 25, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $54,656,000.  In the April 22, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $89,681,203.

29.    In the February 26, 2000 Borrowing Base Certificate and the March 25, 2000 Borrowing Base Certificate, Richard Oshlo, Inacom's Treasurer, specifically represented, among other things, that "no default or event of default or potential default exists."   Accordingly, Inacom, itself, represented that as of the dates of the Borrowing Base Certificates, it was in compliance with the Deutsche Bank Credit Facility, including but not limited to compliance with its minimum net worth covenants.

30.    At all times, from March 17, 2000 through April 17, 2000 Inacom continued to sell services and products, retain employees and pay wages, advertise, pay its obligations, and generally continue to operate its business and perform its business functions.

31.    In addition, from February 16, 2000 through the Petition Date, Inacom continued to pay its indebtedness and reduce the loan balance it owed to Deutsche Bank.  The outstanding balance owed by Inacom to Deutsche Bank under the Credit Agreement was $164,672,000 on February 16, 2000.  By April 22, 2000 that amount had been reduced to $112,672,000, and by the Petition Date, the amount had been further reduced to $66,872,000.  Indeed, as of April 24, 2000, the amounts owed to Deutsche Bank by Inacom were "lower than projected" by Deutsche Bank, thus showing that Inacom was operating in such a manner so as to be able to reduce its

indebtedness even more than was expected. Inacom was even able to pay off its current debts earlier than expected, including paying an extra $15,000,000 to IBM in late March 2000 to pay off a $78,000,000 loan over a month and a half early.

32.   On March 31, 2000, Inacom contacted Deutsche Bank concerning the regularly-scheduled meeting between Inacom and Deutsche Bank scheduled for April 27, 2000. In the March 31, 2000 correspondence concerning the meeting, Inacom made no mention of or reference to any problems or issues concerning the operation of its business or any defaults (existing or potential) or difficulties in meeting its covenants or obligations under the Deutsche Bank Credit Facility.

33.   On April 18, 2000, Thomas Fitzpatrick, Inacom's Chief Financial Officer, learned, by telephone, while on vacation in Cancun, Mexico, that certain accounts receivables allegedly belonging to Compaq had been mistakenly received in Inacom's lockboxes and automatically swept as payments upon the Deutsche Bank Credit Facility. Upon learning this information, Mr. Fitzpatrick, nevertheless, chose to continue his vacation in Mexico and did not return to the United States until the following week.

34.   On April 27, 2000, Compaq, for the first time, notified Deutsche Bank that Compaq claimed that certain receivables owned by Compaq were mistakenly paid into Inacom's lockboxes. Deutsche Bank notified Compaq that it would investigate the matter. Subsequently, Deutsche Bank refused to return the swept funds and, refused to advance further funds to Inacom, giving as the reason an alleged material adverse change under the Deutsche Bank Credit Facility.

35.   Deutsche Bank funded the draw requests of Inacom under the Deutsche Bank Credit Facility on each occasion as requested up through April 28, 2000.

36.    Indeed, it was not until April 28, 2000 that Deutsche Bank provided any indication to Inacom that Deutsche Bank was considering declaring a material adverse change and advancing no further funds to Inacom under the Deutsche Bank Credit Facility. However, Deutsche Bank did not actually declare a material adverse change at that time; instead it continued to investigate Compaq's allegations concerning the commingling of funds paid into Inacom's lockboxes.

37.    In April 2000, Inacom still had thousands of employees, and revenues based upon income statements for the four the weeks ending April 22 of $63 million.

38.    On May 1, 2000 and again on May 26, 2000, Deutsche Bank informed Compaq that it was still investigating the matter of the misapplied funds that Compaq had misdirected to Inacom's bank account.

39.    Throughout February, March, and April, 2000, there was no indication to Inacom, its customers, its lenders, its investment advisors, or the general public that Inacom would cease operations, and during that time, Inacom continued to operate its business and bankruptcy was not clearly imminent.  Throughout February, March, and April, 2000, Inacom was a going concern actively engaged in business.

40.    The aggregate equity of Inacom Corp. on April 22, 2000 was between $44,000,000 and $144,000,000.

41.    Therefore, at least through April 22, 2000, Inacom was solvent.

C.    **Facts Regarding The Parties' Business Relationship**

42.    Beginning in July 1999, Inacom began to purchase product from NCL, whereby NCL would ship product to Inacom on credit.  Inacom purchased product from NCL generally under standard net-thirty day terms.  Inacom's purchases of computer equipment from NCL

began on July 7, 1999. On that day, NCL issued two invoices to Inacom with Net 30 terms and totaling just shy of $40,000. Inacom cut a single check to cover both invoices on August 10, 1999. NCL did not receive and deposit the check until August 23, 1999. Thus began Inacom's pattern of late payments and "held" checks.

43.    After the February 16, 2000 closing of the Compaq Sale, Ingram Entertainment continued to provide product to the Debtors under the same or similar terms as it had prior to the Compaq Sale.

44.    The alleged preferential payments by Inacom to NCL were made by three checks covering 30 invoices. The checks were paid on the following dates and in the following amounts:

|                 |            |
|-----------------|------------|
| March 23, 2000  | $243,760   |
| March 24, 2000  | $460,445   |
| April 4, 2000   | $392,616.  |

45.    A list of all invoices, payment amounts and payment dates of the transfers paid by Inacom to NCL for both the pre-preference and preference periods is attached hereto as Exhibit A.

46.    All of the Payments were made in payment for products Ingram Entertainment previously sold and delivered to Inacom, and which Inacom accepted. The alleged preferential payments are not avoidable under the three part ordinary course of business test.

47.    First, as stipulated by Inacom, under 11 U.S.C. § 547(c)(2)(A), the alleged preferential payments were in payment of a debt incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and Ingram.

48.    Second, under 11 U.S.C. § 547(c)(2)(B), the alleged preferential payments were in payment of a debt incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and Ingram Entertainment.

49.    Here, in the 120 days before the preference period, Inacom paid 26 invoices totaling $866,550 between 75 and 98 days after invoicing.  During the preference period, $923,391 of the $1,109,086 alleged preferential payments were made between 73 and 83 days after invoicing. The alleged preferential payments are entirely consistent with the parties' earlier dealings. Significantly, the preference period payments, based on the invoice date to payment date, remained consistent in terms of the timing of payments on NCL's invoices as those made during the pre-preference period.

50.    During the preference period, NCL did not put Inacom on credit hold or initiate legal proceedings to recover amounts owed by Inacom.

51.    Inacom, prior to the beginning of the preference period, engaged in a pattern or practice of "cutting" checks and holding such checks prior to sending them.  Inacom acknowledges that it regularly held checks in the three and a half month period prior to the beginning of the preference period.  In fact, by the admission of Inacom's Accounts Payable Manager, on many occasions, every check in a check run would be held.

52.    In addition, Inacom consistently held checks for the entire one year period prior to the beginning of the preference period, and, in fact, Inacom regularly held checks between 1993 and 1997.  In short, Inacom's practice of holding checks was usual and ordinary for many years prior to the beginning of the preference period.

53.    Third, under 11 U.S.C. § 547(c)(2)(C), the alleged preferential payments were made according to ordinary business terms.  The payment range during the preference period was not

so idiosyncratic as to fall outside that broad range of payment terms in the industry and so as to be deemed extraordinary.

54.   Contrary to the contention of Plaintiff's expert, data from 2003, three years later than the date the payments were made to Ingram Entertainment, is not relevant.  In addition, data across a number of industries (e.g. telecom and software companies with no break down across any customer base), is simply not relevant to the industry standard test.  Rather, the payment practices of the computer/reseller industry in 2000 is determinative.

55.   In addition, NCL provided thousands of dollars of products and services to Inacom after the first allegedly preferential payment.  These products and services sold to and received by Inacom during the preference period constitute new value pursuant to 11 U.S.C. § 547(c)(4).

## II.   CONCLUSIONS OF LAW

### A.     Jurisdiction And Venue

56.   This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and §§ 547 and 550 of the United States Bankruptcy Code (the "Bankruptcy Code").  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), and (O).

### B.     Inacom's Preference Claim—11 U.S.C. § 547(b)

57.   Inacom brought this adversary proceeding against Ingram Entertainment pursuant to 11 U.S.C. §§ 547 and 550 to avoid transfers of the Debtors' property to wit: the payments to Ingram Entertainment for products previously sold to and accepted by Inacom.  Inacom has failed to meet its burden of proof under 11 U.S.C. § 547(b).  Under Section 547(b) of the Bankruptcy Code, Inacom has the burden of proof to establish that such transfers:

(1)    Were to or for the benefit of Defendant;

(2)    Were for or on account of an antecedent debt owed by the Debtor before such transfer was made;

(3)    Were made while the Debtor was insolvent;

(4)    Were made—

(a)    on or within ninety (90) days before the date of filing of the petition; or

(b)    between ninety (90) days and one year before date of the filing of the petition, if Defendant at the time of the transfer was an insider; <u>and</u>

(5)    Enabled the Defendant to receive more than it would receive if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made, Defendant received payment of such debt to the extent provided by the provisions of 11 U.S.C. § 550.

58.    As a matter of law, Ingram Entertainment has rebutted the presumption of insolvency, and Inacom, as set forth in more detail below, failed to establish that it was insolvent from the beginning of the preference period through April 22, 2000.  Section 550 does not apply if the payments cannot be avoided.

### C.    Inacom Was Not Insolvent At The Time The Payments Were Made

59.    The factual evidence established that Ingram Entertainment has rebutted the presumption of insolvency and, therefore, Inacom has the burden of proof to establish insolvency at the time of the payments made by Inacom to Ingram Entertainment by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); FED. R. EVID. 301; *In re Trans World Airlines, Inc.,* 180 B.R.

389, 404 (Bankr. D. Del. 1994), *aff'd in part, rev'd in part on other grounds*, 203 B.R. 890 (D. Del. 1996), *rev'd*, 134 F.3d 188 (3d Cir. 1998) (affirming the bankruptcy court and reversing the district court's reversal); *In re Lids Corp.*, 281 B.R. 535, 540 (Bankr. D. Del. 2002).

60.    "Insolvency" is defined as a "financial condition such that the sum of . . . [the debtor's] debts is greater than all of . . . [the debtor's] property, at a fair valuation, exclusive of" exempt and fraudulently transferred property.  11 U.S.C. § 101(32)(A); *see also In re Lids Corp.*, 281 B.R. at 540.  This test is commonly referred to as the Balance Sheet Test.  *See id.*  There is no statutory guidance as to the manner of assessing the "fair valuation" of assets so the determination of "[i]nsolvency requires the court to use some practical business judgment about asset valuation." DANIEL R. COWANS,  2 BANKRUPTCY LAW AND PRACTICE 467 (7th ed. 1998).

61.    The Third Circuit, contemplating the proper manner to determine fair valuation, has stated that where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer . . . assets [are] valued on a going concern basis," not a liquidation basis.  *In re Trans World Airlines, Inc.*, 134 F.3d at 193; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992); *In re Lids Corp.*, 281 B.R. at 541 (going concern where company planned to continue operations as usual on valuation date).   Contrarily, "going concern value is not the proper standard if the business is 'on its deathbed'" at the time of the transfer.  *In re Taxman Clothing Co., Inc.* 905 F.2d 166, 170 (7th Cir. 1990).  A company is on its deathbed only when it is "wholly inoperative, defunct, or dead on its feet."  *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D. Pa. 1988).   Therefore, a company need not be thriving to receive going concern valuation.  *Id.*

62.    Inacom, as of April 22, 2000, employed thousands of people, continued to carry on its business, and was actively engaged in pursuing the Service Business.  Inacom did not face a

liquidity crisis until at the earliest April 28, 2000. Inacom was a going concern, through at least

April 22, 2000. Therefore, in valuing Inacom for purposes of determining whether Inacom was

solvent on the date of the alleged preferential payments, Inacom as a matter of law should be

valued on a going concern basis, not as a company in liquidation.

63.    The Third Circuit has defined the fair valuation of assets, in the going concern

context, as "'market value' rather than 'distress value,' but . . . the valuation must be analyzed 'in

a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming

a 'willing seller' and a 'willing buyer.'" *In re Trans World Airlines, Inc.*, 134 F.3d at 193-94; *see*

*also In re Lids Corp.*, 281 B.R. at 541.

64.    A "reasonable time" is defined as an estimate of the time that a typical

creditor would find optimal: not so short a period that the value of the goods is

substantially impaired via a forced sale, but not so long a time that a typical creditor

would receive less satisfaction of its claims, as a result of the time value of money and

typical business needs, by waiting for the possibility of a higher price. *In re Trans World*

*Airlines, Inc.*, 134 F.3d at 195 (in that case a reasonable time was twelve (12) to eighteen

(18) months); *see also In re Lids Corp.*, 281 B.R. at 541.

65.    In this context, the fair valuation/market value is "the amount that may be realized

if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's

length transaction under present conditions for the sale of comparable business enterprises, as

such conditions can reasonably evaluated by . . ." an expert. *In re Lids Corp.*, 281 B.R. at 541.

66.    Furthermore, the debtor's "assets must be valued at what they are reasonably worth

at the time of the allegedly preferential transfers and <u>not what they turned out to be worth at</u>

<u>some time after the bankruptcy intervened</u>." *In re Davis*, 120 B.R. 823, 825 (Bankr. W.D. Pa.

1990) (emphasis added); *see also Total Tech. Servs., Inc. v. Whitworth*, 150 B.R. 893, 900 (Bankr. D. Del. 1993). Consistent with this rule, the Third Circuit has stated that "the use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's 'insolvency' element has been criticized by courts and commentators alike." *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996). Indeed, "[t]here is overwhelming authority to the effect that . . . subsequent dismemberment [of the debtor] . . . should not enter into the picture." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197-98 (3d Cir. 1998) (quoting Lawrence P. King, 2 Collier on Bankruptcy ¶ 101.32[4], at 101-16 (15th ed. 1997)).

67.    Once the fair value of the debtor is determined, "it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if "the debtor was insolvent." *In re Lids Corp.*, 281 B.R. at 545. Unlike assets, debts are measured at their face value and not at market value. *In re Trans World Airlines, Inc.*, 134 F.3d at 190, 196; *In re Lids Corp.*, 281 B.R. at 545. Contingent liabilities, however, are "limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *In re Trans World Airlines, Inc.*, 134 F.3d at 196-98; *see also In re Lids Corp.*, 281 B.R. at 546. Therefore, "[c]ontingent liabilities do not include costs associated with liquidation or dissolution of the debtor" as this would inherently contradict the going concern status of the debtor. *In re Lids Corp.*, 281 B.R. at 546; *see also In re Trans World Airlines, Inc.*, 134 F.3d at 197-98.

68.    Further, hindsight is forbidden when a court is assessing whether an entity was on its financial deathbed at the time of the transfer(s). *In re Payless Cashways, Inc.*, 290 B.R. 689, 705 (Bankr. W.D. Mo. 2003); *In re DAK Indus., Inc.*, 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996). Therefore, evidence after April 22, 2000 time period, is irrelevant to the inquiry.

69. Under the foregoing valuation standards, Ingram Entertainment has provided sufficient evidence to rebut the presumption of insolvency, thus shifting the burden of persuasion to Inacom to establish by a preponderance of the evidence that Inacom was insolvent during the period of the alleged preferential payments at issue in this action.

70. Inacom was solvent at least through April 22, 2000. As of April 22, 2000, Inacom had an aggregate equity value of between $44,000,000 and $144,000,000. The legal conclusion is based upon on the April 2000 income statement prepared by Inacom, the collective opinions of third parties with substantial expertise in valuing business, including but not limited to Goldman Sachs and Houlhan Lokey, Compaq Computer's determination that it would enter into a $55 million dollar subordinated loan with Inacom and a three year, $420 million dollar service agreement, a separate service and support agreement whereby Inacom's employees were to work with Compaq's in the future, the revolving credit facility with Deutsche Bank with availability in the range of $89,681,203 in April and Borrowing Base Reports prepared by Inacom.

71. Because Inacom was solvent through April 22, 2000, Inacom is not entitled to any recovery as to any of the alleged preferential payments made prior to that date, having failed to satisfy the requirement of 11 U.S.C. § 547(b)(3).

### D.    Ordinary Course Of Business Defense

72. Ingram Entertainment has asserted an affirmative defense pursuant to 11 U.S.C. § 547(c)(2) (the "Ordinary Course Defense"). The purpose of the Ordinary Course Defense "is to leave undisturbed normal financial relations between a debtor and its creditors, even as a company approaches bankruptcy." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3d Cir. 1999); *see also In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223 (3d Cir. 1994). "It protects 'recurring, customary credit transactions that are incurred and paid in the ordinary

course of business of the debtor and the debtor's transferee.'" *In re First Jersey Sec., Inc.*, 180 F.3d at 512 (citation omitted).

73.    Under the Ordinary Course Defense, Inacom cannot avoid any alleged preferential payments to the extent such payments are:

(A)    In payment of a debt incurred by Debtor in the ordinary course of the business or financial affairs of Debtor and Ingram Entertainment;

(B)    Made in the ordinary course of business or financial affairs of Debtor and Ingram Entertainment; and

(C)    Made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A)-(C).  It is undisputed and the parties have stipulated that the transfers satisfy 11 U.S.C. § 547(c)(2)(A).  Therefore, the first element of the Ordinary Course defense is satisfied.

74.    The second element is often referred to as the "subjective" test, as it examines the relationship between the specific debtor and creditor.  11 U.S.C. § 547(c)(2)(B).  In addressing this element, courts consistently review the pre-preference period of business and then compare that data to the preference period.  *See In re Big Wheel Holding Co.*, 223 B.R. 669, 674 (Bankr. D. Del. 1998) (holding that because the debtor paid invoices late in the pre-insolvency period, then late payments were the ordinary course of business for the preference period); *see also In re Color Tile, Inc.*, 239 B.R. 872, 875 (Bankr. D. Del. 1999) (granting summary judgment in favor of the defendant; during pre-insolvency period, payments were made in a range of fifteen (15) to seventy-two (72) days; during preference period, payments were made is a range of twenty-two (22) to forty-seven (47) days, well with in the pre-insolvency range).

75.   Between Debtor and Ingram Entertainment there was an established business relationship in which the form and tender of the alleged preferential transfers parallel the pre-preference period transfers.

76.   Further, based on the accounting data and other evidence presented, there was no unusual collection activity during the preference period that resulted in the payment of any amounts at issue in the Complaint.  *See In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir. 1986).

77.   Indeed, the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense.  Indeed, holding checks may be deemed in the ordinary course of business if such practice is consistent with the actions of the parties prior to the preference period.  *See generally In re T.B. Home Sewing Enters., Inc*., 173 B.R. 790 (Bankr. N.D. Ga. 1993) (holding checks not inconsistent with prior dealings); *In re Narragansett Clothing Co.*, 146 B.R. 609 (Bankr. R.I. 1992) (same); *In re Powerine Oil Co.*, 126 B.R. 790 (9th Cir. BAP 1991) (holding of checks but one factor in determining whether payments were outside the ordinary course of business; no evidence presented to the court with respect to the debtor's practices prior to the preference period); *In re Kroh Bros. Dev. Co.*, 115 B.R. 1011 (Bankr. W.D. Mo. 1990) (also a check holding case; "necessary to look to the payment history for the time before the preference period. . . to see how the parties dealt with the payments before").

78.   In this case, by Inacom's own admission, Inacom held checks for at least the three and one half months prior to the beginning of the preference period.  Additionally, Inacom started a practice of holding checks as early as 1993.  Finally, the payment range, as discussed above, shows no marked difference between the pre-preference period and the preference period,

which substantiates that any alleged holding of checks either occurred both during the pre-preference period and in the preference period or that any such holding of checks had no impact on the alleged preferential payments received. Therefore, the fact that a payment by the Debtor during the preference period was made in connection with a held check does not remove such payment from the protection afforded by the ordinary course of business defense.

79.     Moreover, the held checks issue is of little import in this case since the actual applied date is used for the pre-preference period data and the preference period data. The actual application of payments to invoices, rather than when a check was issued or held, is more indicative for the ordinary course of business defense (i.e. comparing the payment history in the pre-preference period to the preference period).

80.     The third element of the ordinary course of business defense is referred to as the "objective" test, as it examines whether transfers were made "according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2)(C); *In re First Jersey Sec., Inc.*, 180 F.3d at 513. This phrase encompasses "'the practices in which firms similar in some general way to the creditor in question engage.'" *See In re First Jersey Sec., Inc.*, 180 F.3d at 513 (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 224); *see also In re U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. 2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *10 (Bankr. D. Del. February 20, 2001). This element is not a high hurdle for the creditor as "this test may be satisfied as long as the payment was made within the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage . . . [and] only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary." *In re Cocolat, Inc.*, 176 B.R. 540, 550 (Bankr. N.D. Cal. 1995) (emphasis in

original); *see also In re First Jersey Sec., Inc.*, 180 F.3d at 513; *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 220, 224; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

81.    Further, based on the extensive relationship between NCL and Inacom, the Third Circuit permits a substantially greater departure from the range of normal industry terms.  *See In re Molded Acoustical Prods., Inc.,* 18 F.3d at 226 ("[W]hen the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard and still find a haven in subsection C."); *see also In re First Jersey Sec., Inc.,* 180 F.3d 504, 513 (3d Cir. 1999); *In re U.S. Interactive, Inc.,* 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *10 (Bankr. D. Del. Feb. 20, 2001). Therefore, considering the length and breadth of the relationship between Ingram and Inacom, the transfers meet the third element of the Ordinary Course Defense under 11 U.S.C. § 547(c)(2)(C).

82.    The alleged preferential payments to Ingram Entertainment cannot be considered so "idiosyncratic" or "unusual" as to fall outside that broad range so as to be deemed extraordinary.

83.    To the extent that Inacom asserts that all checks that were "held" by Debtor before being transferred to Ingram Entertainment were not transferred according to ordinary business terms in the industry, again Inacom is incorrect.  Courts generally find that the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense.  Instead, the courts examine the practices in which firms similar in some general way to the creditor in question engage. *See In re T.B. Home Sewing Enters., Inc.*, 173 B.R. 790 (holding checks not inconsistent with industry); *In re Narragansett Clothing Co.*, 146 B.R. 609 (same); *see also In re L. Bee Furniture Co., Inc.,* 206 B.R. 981

(Bankr. M.D. Fla. 1997) (not adopting objective standard; but stating even if it had the holding of checks was within industry standards). Here, it is within industry standards/terms for checks to be held. The practice of holding checks is not "so idiosyncratic as to fall outside that broad range that should be deemed extraordinary."

### E.    New Value Defense

84.    In response to Inacom's preference claim, Ingram Entertainment has also asserted that, pursuant to 11 U.S.C. § 547(c)(4)(A) & (B), Inacom cannot avoid certain transfers based on the "New Value" Defense. Section 547(c)(4) provides that Inacom may not avoid a transfer that was to or for the benefit Ingram Entertainment, to the extent that, after said transfer, Dell gave new value to of for the benefit of Debtor that:

> (A)    Was not secured by an otherwise unavoidable security interest; and
>
> (B)    On account of which new value Debtor did not make an otherwise unavoidable transfer to or for the benefit of Ingram Entertainment.

New value is defined as: "money or money's worth in goods, services, or new credit . . . ." 11 U.S.C. § 547(a)(2). Section 547(a)(2)'s definition is broad enough to encompass any type of consideration that would support a contract. *See In re Discovery Zone, Inc.*, 300 B.R. 856, 860 (Bankr. D. Del. 2003); *see also In re Spada*, 903 F.2d 971, 971 (3d Cir. 1990) (§ 547(a)(2) construed to codify usual rules of consideration).

85.    In this case, the evidence shows that Ingram Entertainment provided thousands of dollars of "new value" to Inacom. These new products and services were sold to and received by Inacom during the preference period and were not secured by an otherwise unavoidable security interest.

III.    <u>CONCLUSION</u>

92.    For the foregoing reasons, the Court finds that Ingram Entertainment is not liable to Inacom for any of the alleged preferential payments, and that Inacom is entitled to no relief or recovery whatsoever against Ingram Entertainment.


DATED:  August 15, 2005


By: _____/s/ Thomas G. Macauley_____
        Thomas G. Macauley (ID No. 3411)
        Elizabeth D. Power (ID No. 4135)
        ZUCKERMAN SPAEDER LLP
        919 Market Street, Suite 990
        P.O. Box 1028
        Wilmington, Delaware  19899-1028
        Tel.: (302) 427-0400
        Fax: (302) 427-8242

        -and-

        Jonathan P. Hersey (CA Bar No. 189240)
        Scott B. Lieberman (CA Bar No. 208764)
        SHEPPARD, MULLIN, RICHTER &
        HAMPTON LLP
        650 Town Center Drive, 4th Floor
        Costa Mesa, CA  92626
        Telephone:  (714) 513-5100
        Facsimile:  (714) 513-5130

        Attorneys for Defendant
        INGRAM ENTERTAINMENT INC., as
        successor in interest to NASHVILLE
        COMPUTER LIQUIDATORS, L.P.

W02-OC:3JPH1\41400669.1