**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re ) | |
| ) | |
| INACOM CORP., *et al.*, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| ) | |
| INACOM CORP., on behalf of all affiliated Debtors, ) | Civil Action No. 04-593 (GMS) |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| INGRAM ENTERTAINMENT INC., as successor ) | |
| in interest to NASHVILLE COMPUTER ) | |
| LIQUIDATORS, L.P., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT INGRAM ENTERTAINMENT INC.'S
TRIAL BRIEF[1]**

**I.  INTRODUCTION AND NATURE OF THE CASE.**

Inacom's complaint against Ingram Entertainment Inc. ("IEI") demands return of approximately $1.1 million of alleged preferential transfers made to IEI's predecessor, Nashville Computer Liquidators, L.P. ("NCL"). Inacom's inability to prove its insolvency at the time it made the challenged payments (more than two and a half months before filing bankruptcy in June 2000) is fatal to the entire complaint. But even if Inacom were able to prove its insolvency, IEI has at least two defenses. First, the alleged preference payments (or a significant portion of them) were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2). Second, pursuant to 11 U.S.C. § 547(c)(4), IEI provided new value to Inacom for which Ingram is

---

[1] Ingram Entertainment submits this trial brief in anticipation of the Court's ruling on its pending motion for a jury trial. Ingram understands that Plaintiff is not submitting a trial brief at this time. Ingram therefore reserves the right to amend or supplement this Trial Brief at such time that Plaintiff may file its Trial Brief.

-1-

entitled to a set-off of any amount Inacom may be entitled to recover.

II.     **THE FACTS AND DEFENSES DEFENDANT WILL ESTABLISH AT TRIAL.**

A.     The three disputed transfers in this case were received by NCL on March 23, 2000, March 24, 2000, and April 4, 2000, respectively. All three checks were deposited and fully honored by April 6, 2000.

B.     Inacom was solvent at least through April 22, 2000. As a result, Inacom cannot satisfy the requirements of 11 U.S.C. § 547(b)(3) to prove by a preponderance of the evidence that it was insolvent at the time of the transfers. As a result, Inacom is not entitled to recover any of the payments.

C.     All, or a significant portion, of the payments to NCL were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2), and more specifically the payments were made:

1)     in payment of a debt incurred by Inacom in the ordinary course of business or financial affairs of Inacom and NCL under 11 U.S.C. § 547(c)(2)(A);

2)     in the ordinary course of business or financial affairs of Inacom and NCL under 11 U.S.C. § 547(c)(2)(B); and

3)     according to ordinary business terms pursuant to 11 U.S.C. § 547(c)(2)(C).

D.     NCL gave subsequent new value to Inacom under 11 U.S.C. § 547(c)(4).

III.    **DEFENDANT'S THEORIES OF DEFENSE.**

A.     **Brief Factual Background.**

Inacom filed bankruptcy on June 16, 2000. Pursuant to 11 U.S.C. § 547, the complaint demands the return of all money paid by Inacom to NCL during the 90 days preceding the bankruptcy filing (the "Preference Period"). The Preference Period therefore ranges from March 17 to June 16, 2000. In total, Inacom demands $1,109,086. The challenged payments

were made by three checks covering 30 invoices. The checks were paid on the following dates and in the following amounts:

| | |
|---|---|
| March 24, 2000 | $ 243,760 |
| March 24, 2000 | $ 460,445 |
| April 4, 2000 | $ 392,616. |

For the reasons discussed below, the events preceding Inacom's bankruptcy will determine whether the payments made to NCL during the Preference Period are avoidable. It is therefore helpful to understand some of the history behind Inacom's business and the course of dealings between the parties.

### 1.   Inacom's Distribution and Service Businesses.

In the early 1990s, Inacom was a thriving company that engaged in the business of purchasing computer hardware from large manufacturers and distributing it to smaller business and individual end users. By the mid-1990s, however, direct selling by large manufacturers such as Dell and Gateway began to hurt Inacom's business. The company therefore decided to shift its focus from computer hardware configuration and distribution to information technology support and consulting services. In 1999 (at the height of the Y2K scare), the company earned $5 billion of revenues from its distribution business but only recognized a 4.3% margin on those sales. By contrast, the company recognized a 31.5% margin on the $815 million of revenues it collected from its service business. The service-side of the business was far more lucrative.

### 2.   Inacom Sells the Distribution Business to Compaq But Continues the Service Business as a Going Concern.

On February 15, 2000, Inacom sold the assets of its hardware distribution business to Compaq for $369.5 million. In connection with the asset sale, Inacom and Compaq entered into several multi-year contracts, including a three-year, $800 million Sales, Service and Supply Agreement, as well as a $55 million Subordinated Securing Revolving Credit that Inacom could draw upon to support the continued operation of its service business. Inacom used the proceeds from the asset sale to significantly pay down its bank debt.

Before purchasing the distribution business and executing the long-term service

agreements, Compaq required Inacom to obtain an expert opinion of its solvency. The opinion was issued by the firm of Houlihan Lokey, just five weeks before Inacom made the alleged preferential payments to NCL. It concluded, of course, that Inacom was a solvent, going concern whose fair value of saleable assets exceeded its stated and contingent liabilities.

### 3.    Inacom's Funding Crisis Did Not Arise Until Late April 2005.

Apparently, during the transition of the distribution business to Compaq in February and March 2000, Compaq may have directed its new customers to continue to remit payments to Inacom's lockboxes. Inacom forwarded the funds to its lenders. Between February 15 and April 18, 2000, Inacom drew approximately $160 million on its bank loans, but also paid down $156.5 million of the loan. Its net borrowing amounted to only $3.5 million. From February 16 through the end of April 2000, Inacom had tens, if not hundreds, of millions of dollars of borrowing capability under its existing credit lines.

Compaq did not inform Inacom and its lenders of its claim to the receivables until April 18, 2000. The dispute with Compaq ultimately caused the banks to cease further lending. Inacom eventually began searching for a buyer for its remaining service business.

During the first week of June 2000, a syndicate of Inacom's lenders provided the company an extension until June 9, 2000 to pay off its $115 million debt or find a buyer for the service business. When June 9 arrived without a buyer, the banks extended Inacom's credit another week, until June 16.

Inacom closed its doors on June 16, 2000. _At the time of its filing, Inacom's Bankruptcy Schedules reported $956.6 million of assets and $560.7 million of liabilities._

### 4.    Inacom's Dealings with NCL.

Inacom's purchases of computer equipment from NCL began on July 7, 1999. On that day, NCL issued two invoices to Inacom with Net 30 terms and totaling just shy of $40,000. Inacom cut a single check to cover both invoices on August 10, 1999. NCL did not receive and deposit the check until August 23, 1999. Thus began Inacom's pattern of late payments and "held" checks.

From July 1999 through the time when the parties ceased doing business in early 2000, Inacom made approximately 430 different purchases from NCL totaling approximately $19,000,000. Though virtually every check was dated about 30 days after invoicing, <u>only one invoice was paid on time</u>. The rest were several weeks to several months late.

### B.     Inacom was Not Insolvent at the Time the Payments Were Made.

The factual evidence establishes that IEI has rebutted the presumption of insolvency and, therefore, Inacom has the burden of proof to establish insolvency at the time of the payments made by Inacom to IEI by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); FED. R. EVID. 301; *In re Trans World Airlines, Inc.,* 180 B.R. 389, 404 (Bankr. D. Del. 1994), *aff'd in part, rev'd in part on other grounds*, 203 B.R. 890 (D. Del. 1996), *rev'd*, 134 F.3d 188 (3d Cir. 1998) (affirming the bankruptcy court and reversing the district court's reversal); *In re Lids Corp.*, 281 B.R. 535, 540 (Bankr. D. Del. 2002);.

"Insolvency" is defined as a "financial condition such that the sum of . . . [the debtor's] debts is greater than all of . . . [the debtor's] property, at a fair valuation, exclusive of" exempt and fraudulently transferred property. 11 U.S.C. § 101(32)(A); *see also In re Lids Corp.*, 281 B.R. at 540. This test is commonly referred to as the Balance Sheet Test. *See id*. There is no statutory guidance as to the manner of assessing the "fair valuation" of assets so the determination of "[i]nsolvency requires the court to use some practical business judgment about asset valuation." DANIEL R. COWANS, 2 BANKRUPTCY LAW AND PRACTICE 467 (7th ed. 1998).

The Third Circuit, contemplating the proper manner to determine fair valuation, has stated that where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer . . . assets [are] valued on a going concern basis," not a liquidation basis. *In re Trans World Airlines, Inc*., 134 F.3d at 193; *see also Moody v. Sec. Pac. Bus. Credit, Inc*., 971 F.2d 1056, 1067 (3d Cir. 1992); *In re Lids Corp.*, 281 B.R. at 541 (going concern where company planned to continue operations as usual on valuation date). Contrarily, "going concern value is not the proper standard only if the business is 'on its deathbed'" at the time of the transfer. *In re Taxman Clothing Co., Inc*. 905 F.2d 166, 170 (7th Cir. 1990). A company is on its deathbed only when it is "wholly inoperative, defunct, or dead on its feet." *In re Art Shirt Ltd.*, *Inc.*, 93 B.R. 333, 341 (E.D. Pa. 1988). Therefore, a company need not be thriving to

receive going concern valuation.  *Id.*

Inacom, as of April 22, 2000, employed thousands of people, continued to carry on its business, and was actively engaged in pursuing the Service Business.  Its liquidity crisis did not arise until April 27, 2000.  Therefore, in valuing Inacom for purposes of determining whether Inacom was solvent on the date of the alleged preferential payments, Inacom as a matter of law should be valued on a going concern basis, not as a company in liquidation.

The Third Circuit has defined the fair valuation of assets, in the going concern context, as "'market value' rather than 'distress value,' but . . . the valuation must be analyzed 'in a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming a 'willing seller' and a 'willing buyer.'"  *In re Trans World Airlines, Inc.*, 134 F.3d at 193-94; *see also In re Lids Corp.*, 281 B.R. at 541.

A "reasonable time" is defined as an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claims, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price.  *In re Trans World Airlines, Inc.*, 134 F.3d at 195 (in that case a reasonable time was twelve (12) to eighteen (18) months); *see also In re Lids Corp.*, 281 B.R. at 541.

In this context, the fair valuation/market value is "the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can reasonably evaluated by . . ." an expert.  *In re Lids Corp.*, 281 B.R. at 541.

Furthermore, the debtor's "assets must be valued at what they are reasonably worth at the time of the allegedly preferential transfers and <u>not what they turned out to be worth at some time after the bankruptcy intervened</u>."  *In re Davis*, 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990) (emphasis added); *see also Total Tech. Servs., Inc. v. Whitworth*, 150 B.R. 893, 900 (Bankr. D. Del. 1993).  Consistent with this rule, the Third Circuit has stated that "the use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's

'insolvency' element has been criticized by courts and commentators alike." *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996). Indeed, "[t]here is overwhelming authority to the effect that . . . subsequent dismemberment [of the debtor] . . . should not enter into the picture." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197-98 (3d Cir. 1998) (quoting Lawrence P. King, 2 Collier on Bankruptcy ¶ 101.32[4], at 101-16 (15th ed. 1997)).

Once the fair value of Debtor is determined, "it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if "the debtor was insolvent. *In re Lids Corp.*, 281 B.R. at 545. Unlike assets, debts are measured at their face value and not at market value. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 190, 196 (3d Cir. 1998); *In re Lids Corp.*, 281 B.R. at 545. Contingent liabilities, however, are "limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *In re Trans World Airlines, Inc.*, 134 F.3d at 196-98; *see also In re Lids Corp.*, 281 B.R. at 546. Therefore, "[c]ontingent liabilities do not include costs associated with liquidation or dissolution of the debtor" as this would inherently contradict the going concern status of the debtor. *In re Lids Corp.*, 281 B.R. at 546; *see also In re Trans World Airlines, Inc.*, 134 F.3d at 197-98.

Further, hindsight is forbidden when a court is assessing whether an entity was on its financial deathbed at the time of the transfer(s). *In re Payless Cashways, Inc.*, 290 B.R. 689, 705 (Bankr. W.D. Mo. 2003); *In re DAK Indus., Inc.*, 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996). Therefore, evidence after April 22 time period, is irrelevant to the inquiry.

Under the foregoing valuation standards, IEI has provided sufficient evidence to rebut the presumption of insolvency, thus shifting the burden of persuasion to Inacom to establish by a preponderance of the evidence that Inacom was insolvent during the period of the alleged preferential payments at issue in this action.

The evidence will demonstrate that Inacom was solvent at least through April 22, 2000. IEI's expert witnesses, Jason Fensterstock and Rich Whalen, experienced investment bankers, will testify that as of April 22, 2000, Inacom had an aggregate equity value of between $44,000,000 and $144,000,000 and, thus, was solvent by a substantial margin. The conclusion was the result of extensive analysis which is detailed in their valuation reports. Confirming the conclusions of the experts are additional facts, including Inacom's restructuring into a service

business that historically provided greater margins and faster growth than the distribution business, which prior to February 16, 2000, had comprised 90% of Inacom's business; the April 2000 income statement prepared by Inacom, reflecting higher gross margins for the recently restructured business; the collective opinions of third parties with substantial expertise in valuing business, including but not limited to Goldman Sachs and Houlhan Lokey; Compaq Computer's determination that it would provide a $55 million dollar subordinated loan facility to Inacom, a three year service level agreement guaranteeing Inacom incremental revenue in the amount of $420 million, and a separate service and support agreement whereby Inacom's employees were to work with Compaq's in the future; and the revolving credit facility with Deutsche Bank with substantial loan funding availability in the range of $89,681,203 in April.

Because Inacom was solvent through April 22, 2000, Inacom is not entitled to any recovery as to any of the payments made to IEI.

### C.    Ordinary Course Of Business Defense.

IEI has asserted an affirmative defense pursuant to 11 U.S.C. § 547(c)(2) (the "Ordinary Course Defense"). The purpose of the Ordinary Course Defense "is to leave undisturbed normal financial relations between a debtor and its creditors, even as a company approaches bankruptcy." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3d Cir. 1999); *see also In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223 (3d Cir. 1994). "It protects 'recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee.'" *In re First Jersey Sec., Inc.*, 180 F.3d at 512 (citation omitted).

Under the Ordinary Course Defense, Inacom cannot avoid any alleged preferential payments to the extent such payments are:

(A)    in payment of a debt incurred by Debtor in the ordinary course of the business or financial affairs of Debtor and IEI;

(B)    made in the ordinary course of business or financial affairs of Debtor and IEI; and

(C)    made according to ordinary business terms.

It is undisputed and the parties have stipulated that the transfers satisfy 11 U.S.C. § 547(c)(2)(A). Therefore, the first element of the Ordinary Course defense is satisfied.

The second element is often referred to as the "subjective" test, as it examines the relationship between the specific debtor and creditor. 11 U.S.C. § 547(c)(2)(B). In addressing this element, courts consistently review the pre-preference period of business and then compare that data to the preference period. *See In re Big Wheel Holding Co.*, 223 B.R. 669, 674 (Bankr. D. Del. 1998) (holding that because the debtor paid invoices late in the pre-insolvency period, then late payments were the ordinary course of business for the preference period); *see also In re Color Tile, Inc.*, 239 B.R. 872, 875 (Bankr. D. Del. 1999).

Here, $923,391 of the $1,109,086 alleged preferential payments were made between 73 and 83 days after invoicing. The remaining $185,695 was paid between 111 and 158 days. In the 120 days <u>before</u> the Preference Period, Inacom paid 26 invoices totaling $866,550 between 75 and 98 days after invoicing. The alleged preferential payments are entirely consistent with the parties' earlier dealings.

Inacom's argument that these alleged preference payments fall outside the parties' ordinary course of dealing because Inacom sat on the cut checks for months before delivering them to NCL is belied by Inacom's own payment history with NCL and other vendors. Inacom sat on *all* checks it sent to NCL. Plus, several former Inacom employees, including its former Controller and VP of Operations Leon Kirkman, have testified that Inacom had a practice for at least a year before filing bankruptcy of holding checks for all vendors. Inacom actually started a practice of holding checks as early as 1993. Further, the payment range, as discussed above, shows no marked difference between the pre-Preference Period and the Preference Period, which substantiates that any alleged holding of checks either occurred both during the pre-Preference Period and in the Preference Period *or* that any such holding of checks had no impact on the payments received.

Indeed, the held checks issue is of little import in this case since IEI's data is not in any way based on check date in comparison to the date an invoice was paid. The actual applied date is used for the pre-Preference Period data and the Preference Period data. The actual application of payments to invoices, rather than when a check was issued or held, is more

indicative for the ordinary course of business defense (i.e. comparing the payment history in the pre-Preference Period to the Preference Period).

Moreover, the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense. Holding checks may be deemed in the ordinary course of business if such practice is consistent with the actions of the parties prior to the preference period. *See In re T.B. Home Sewing Enters., Inc.*, 173 B.R. 790 (Bankr. N.D. Ga. 1993) (holding checks not inconsistent with prior dealings); *In re Narragansett Clothing Co.*, 146 B.R. 609 (Bankr. D.R.I. 1992) (same); *In re Powerine Oil Company*, 126 B.R. 790 (9th Cir. BAP 1991) (holding of checks but one factor in determining whether payments were outside the ordinary course of business; no evidence presented to the court with respect to the debtor's practices prior to the preference period); *In re Kroh Bros. Dev. Co.*, 115 B.R. 1011 (Bankr. W.D. Mo. 1990) (also a check holding case; "necessary to look to the payment history for the time before the preference period. . . to see how the parties dealt with the payments before.").

Further, based on the accounting data and other evidence presented, there was no unusual collection activity during the Preference Period that resulted in the payment of any amounts at issue in the Complaint. *See In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir. 1986).

The third element of the ordinary course of business defense is referred to as the "objective" test, as it examines whether transfers were made "according to ordinary business terms." *See* 11 U.S.C. § 547(c)(2)(C); *In re First Jersey Sec., Inc.*, 180 F.3d at 513. This phrase encompasses "'the practices in which firms similar in some general way to the creditor in question engage.'" *See id.* (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 224); *see also In re U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. 2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *10 (Bankr. D. Del. Feb. 20, 2001) (Ex. A). This element is not a high hurdle for the creditor as "this test may be satisfied as long as the payment was made within the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage . . . [and] only dealings so <u>idiosyncratic</u> as to fall outside that broad range should be deemed extraordinary." *In re Cocolat, Inc.,* 176 B.R. 540, 550

(Bankr. N.D. Cal. 1995) (emphasis in original); *see also In re First Jersey Sec., Inc.*, 180 F.3d at 513; *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 220, 224; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

The payments to IEI cannot be considered so "idiosyncratic" or "unusual" as to fall outside that broad range so as to be deemed extraordinary. Further, based on IEI's and Inacom's steady and consistent pre-insolvency relationship, the Third Circuit permits a substantially greater departure from the range of normal industry terms. *See In re Molded Acoustical Products, Inc.*, 18 F.3d at 226 ("[W]hen the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard and still find a haven in subsection C."); *see also In re First Jersey Securities, Inc.,* 180 F.3d 504, 513 (3d Cir. 1999); *In re U.S. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. 2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *10 (Bankr. D. Del. Feb. 20, 2001).

To the extent that Inacom asserts that all checks that were "held" by Debtor before being transferred to IEI were not transferred according to ordinary business terms in the industry, again Inacom is incorrect. Courts generally find that the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense. Instead, the courts examine the practices in which firms similar in some general way to the creditor in question engage. *See In re T.B. Home Sewing Enterprises, Inc*., 173 B.R. 790 (holding checks not inconsistent with industry); *In re Narragansett Clothing Co.*, 146 B.R. 609 (same); *see also In re L. Bee Furniture Co., Inc.,* 206 B.R. 981 (Bankr. M.D. Fla. 1997) (not adopting objective standard; but stating even if it had the holding of checks was within industry standards). Here, it is within industry standards/terms for checks to be held. The practice of holding checks is not "so idiosyncratic as to fall outside that broad range that should be deemed extraordinary."

### D. New Value Defense.

In response to Inacom's preference claim, IEI has also asserted that, pursuant to 11 U.S.C. § 547(c)(4)(A) & (B), Inacom cannot avoid certain transfers based on the "New

Value" Defense.  Section 547(c)(4) provides that Inacom may not avoid a transfer that was to or for the benefit IEI, to the extent that, after said transfer, IEI gave new value to of for the benefit of Debtor that:

      (A)    was not secured by an otherwise unavoidable security interest; and

      (B)    on account of which new value Debtor did not make an otherwise unavoidable transfer to or for the benefit of IEI.

New value is defined as: "money or money's worth in goods, services, or new credit . . . ."  11 U.S.C. § 547(a)(2).  Section 547(a)(2)'s definition is broad enough to encompass any type of consideration that would support a contract.  *See In re Discovery Zone, Inc.*, 300 B.R. 856, 860 (Bankr. D. Del. 2003); *see also In re Spada*, 903 F.2d 971, 971 (3d Cir. 1990) (§ 547(a)(2) construed to codify usual rules of consideration).

In this case, the evidence will show that IEI provided thousands of dollars of "new value" to Inacom.  These new products and services were sold to and received by Inacom during the Preference Period and were not secured by an otherwise unavoidable security interest.

## IV.    THEORY OF DAMAGES.

As set forth in detail above, Inacom cannot establish necessary elements of its preference claim.  Accordingly, IEI denies that Inacom is entitled to any relief or recovery whatsoever against IEI.

## V.    MOTION FOR DIRECTED VERDICT.

IEI reserves the right to assert a Motion for Directed Verdict as circumstances warrant at trial.

## VI.    PROPOSED JURY INSTRUCTIONS AND VERDICT FORMS.

IEI is filing three sets of marked Proposed Jury Instructions and Verdict Forms concurrently herewith.

**VII.  PROPOSED JURY VOIR DIRE QUESTIONS.**

IEI is filing concurrently herewith a list of questions that it requests the Court to ask prospective jurors.

DATED:  August 15, 2005

> By:   /s/ Thomas G. Macauley
> Thomas G. Macauley (ID No. 3411)
> Elizabeth D. Power (ID No. 4135)
> ZUCKERMAN SPAEDER LLP
> 919 Market Street, Suite 990
> P.O. Box 1028
> Wilmington, Delaware  19899-1028
> Tel.: (302) 427-0400
> Fax: (302) 427-8242
>
> -and-
>
> Jonathan P. Hersey (CA Bar No. 189240)
> Scott B. Lieberman (CA Bar No. 208764)
> SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
> 650 Town Center Drive, 4th Floor
> Costa Mesa, CA  92626
> Telephone:  (714) 513-5100
> Facsimile:  (714) 513-5130
>
> Attorneys for Defendant
> INGRAM ENTERTAINMENT INC., as successor in interest to NASHVILLE COMPUTER LIQUIDATORS, L.P.

W02-OC:3JPH1\41400706.1