# EXHIBIT A



Not Reported in B.R.  
Not Reported in B.R., 2001 WL 1820323 (Bankr.D.Del.)  
**(Cite as: 2001 WL 1820323 (Bankr.D.Del.))**

Page 1

▶

Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
In re: CHERRYDALE FARMS, INC., et al., Debtors.
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE USE AND BENEFIT OF THE
BANKRUPTCY ESTATE OF CHERRYDALE FARMS, INC., Plaintiff,
v.
Jerry BROWN, Defendant.
**No. 99-597(PJW).**

Feb. 20, 2001.

Michael F. Bonkowski, Mark Minuti, J. Kate Stickles, Saul Ewing LLP, Wilmington, DE, J. Scott Victor, Jeremy W. Ryan, Saul Ewing LLP, Philadelphia, PA, for Jerry Brown.

Edwin J. Harron, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Mark C. Kopec, Whiteford, Taylor & Preston LLP, Baltimore, Maryland, for the Official Committee of Unsecured Creditors.

MEMORANDUM OPINION

WALSH, Bankruptcy J.

**\*1** Before the Court is the motion (Doc. # 11) for summary judgment by defendant Jerry Brown ("Brown") and the cross motion (Doc. # 14) for summary judgment by plaintiff the Official Committee of Unsecured Creditors for the Use and Benefit of the Bankruptcy Estate of Cherrydale Farms, Inc. ("Committee"). At issue is whether the "ordinary course of business" defense applies to an otherwise preferential $50,000.00 sales commission Brown received from the debtor, Cherrydale Farms, Inc. ("Cherrydale" or "Debtor"). For the reasons discussed below, I will grant summary judgment in favor of Brown.

BACKGROUND

Cherrydale is a supplier of candy and gift items to the fundraising market. It filed a voluntary chapter 11 petition on March 15, 1999. Brown was one of Cherrydale's salespersons. On February 24, 1999, Cherrydale paid Brown $50,000 as a sales commission. On September 2, 1999, the Committee filed this adversary proceeding to recover the payment as a preferential transfer pursuant to § § 547 and 550. [FN1]

> FN1. Unless otherwise indicated, all references to " § ___" are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*

Brown submitted two affidavits, one from himself and the other from Howard Lightstone, the Chief Financial Officer ("CFO") of R & R Operating Partnership, d/b/a Cherrydale Farms, Inc. ("Lightstone Aff."). Howard Lightstone has held this post since 1999. He previously served as Cherrydale's CFO from 1986 to 1994. Cumulatively, he has worked in the industry for 10 years. The affidavits establish the following.

Brown has been a salesperson for Cherrydale since 1990. He has worked in the fund raising and candy industry for approximately 25 years. Cherrydale pays its salespeople on a commission basis. It considers commissions earned as each sale is made but does not pay on commissions until it receives money from the customer. Sales occur throughout the year, but most of its sales are in September through December.

Cherrydale pays salespeople twice a year on earned commissions, once in July which is the end of its fiscal year ("Year End Payment") and once at the beginning of the calendar year between January and March ("First Half Payment"). It also pays a salaried draw. Cherrydale determines the Year End Payment by calculating total sales and gross commissions earned for each salesperson. From this total, it subtracts various expenses, the total of salaried draws and any commission payment already received.

Cherrydale calculates the First Half Payment as follows. First, it determines the total commissions earned by the salesperson. It then subtracts the total salaried draws for the fiscal year (year to date and projected), expenses, and earned commissions for which customers have not yet paid Cherrydale. The balance serves as the maximum amount of the First Half Payment. Within this formula limit, each salesperson determines the actual amount of the First Half Payment received.

Brown requested and received First Half Payments

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  Page 2
Not Reported in B.R., 2001 WL 1820323 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820323 (Bankr.D.Del.))**

since he began working for Cherrydale. He also received First Half Payments from his previous employer, who was Cherrydale's predecessor. In 1999 and 1998, Brown requested and received a First Half Payment of $50,000. In 1997, his First Half Payment was $30,000. In 1996 it was $25,000. Brown attributes the increase to an increase in his sales volumes and commissions. He bases the amount of his request in part on tax considerations.

*2 Brown states Cherrydale ordinarily pays First Half Payments to its salespeople. Based on his years of experience, Brown also states such payment terms are ordinary within the industry. Cherrydale's CFO, Howard Lightstone, agrees.

According to Lightstone, the First Half Payment is a payment that Cherrydale salespeople receive in the ordinary course of business. "Indeed," he states, "it would be difficult for Cherrydale to retain is [sic] sales force if Cherrydale refused to make such First Half Payments and instead refused to pay salespeople money they have rightfully earned. Also, based upon my years of experience with Cherrydale, my familiarity with Cherrydale's industry, my conversations with other salespeople and executives within Cherrydale's industry, such First Half Payments are part of the ordinary business terms in Cherrydale's industry." Lightstone Aff. at 3-4, ¶ ¶ 21-22.

Brown moves for summary judgment under § 547(c)(2). Section § 547(c)(2) prevents avoidance of an otherwise preferential transfer to the extent the transfer was made
  (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
  (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
  (C) made according to ordinary business terms.
11 U.S.C. § 547(c)(2)(A)--(C).
He argues that, even if the First Half Payment is otherwise a preference under § 547(b), it is not avoidable because Cherrydale made the transfer on account of a debt incurred and paid in its ordinary course of business with Brown. He also claims Cherrydale paid according to the ordinary business terms in its industry.

The Committee disputes that § 547(c)(2) applies. It argues that the discretionary nature of the First Half Payments and Cherrydale's practice of not finalizing commission obligations until the end of its fiscal year suggests it did not make the transfer in the ordinary course of business. The Committee also argues that Brown failed to offer evidence of an industry standard exclusive of his dealings with Cherrydale, a defect the Committee claims is fatal to Brown's § 547(c)(2) defense.

The Committee moves for summary judgment in its favor. It claims Cherrydale undisputedly made the First Half Payment during the ninety-day prepetition period and that the transfer is clearly preferential. It offers the amount of the First Half Payment as further proof of Brown's favored treatment, an amount the Committee argues equals the highest early commission payment Brown ever sought and over twice what he sought just a few years before.

DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); [FN2] *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Showalter v. Univ. of Pittsburgh Med. Ctr.,* 190 F.3d 231, 234 (3d Cir.1999). In making this determination, I view the facts "in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Showalter,* 190 F.3d at 234 quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994).

> FN2. Fed.R.Bank.P. 7056 makes Fed.R.Civ.P. 56 applicable to adversary proceedings in bankruptcy.

*3 A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 quoting Fed.R.Civ.P. 56(e). Thus, although the movant has the burden of showing that there is no genuine issue of fact, the nonmovant is "not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. at 2514.

To fall within the § 547(c)(2) exception, Brown must prove by a preponderance of the evidence that Cherrydale incurred the debt in the ordinary course of its business with Brown; that it was ordinary as between the parties; and ordinary in the industry

examined as a whole. 11 U.S.C. § 547(g); *In re Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995).

The Committee does not genuinely dispute the initial element and it seems clear to me that Cherrydale incurred the First Half Payment in the ordinary course of its dealings with Brown. The gist of the Committee's argument focuses on the second and third elements of § 547(c)(2). Section 547(c)(2)(B) sets forth a "subjective" test relating solely to the dealings between the parties. *SEC v. First Jersey Sec. (In re First Jersey Sec.),* 180 F.3d 504, 512 (3d Cir.1999). Section 547(c)(2)(C) sets forth an "objective" test relating to the billing practices generally within the relevant industry. *Fiber Lite Corp. v. Molded Acoustical Prod. (In re Molded Acoustical Prod.),* 18 F.3d 217, 224 (3d Cir.1994).

The inquiry under the subjective test is whether the transfer was ordinary as between Brown and Cherrydale. To qualify, the First Half Payment must be consistent with Brown and Cherrydale's prior business dealings. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 96 B.R. 474, 476-77 (D.N.J.1998) aff'd 891 F.2d 66 (3d Cir.1989). It need not, however, possess a rigid similarity to each past transaction. *Id.* Furthermore, "[t]he transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally." *Id.* at 477 quoting *In re Economy Milling Co.,* 37 B.R. 914, 922 (D.S.C.1983). The disputed transfer must nevertheless be comparable to prior transactions so as not to indicate a significantly adverse change in the Debtor's liquidity. *Id.*

The inquiry under the objective test of § 547(c)(2)(C) is whether Cherrydale made the First Half Payment according to ordinary business terms. " '[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." [FN3] *Molded Acoustical,* 18 F.3d at 224 quoting *In re Tolona Pizza Prod.,* 3 F.3d 1029, 1033 (7th Cir.1993). The Third Circuit permits a greater departure from the range of normal industry terms based on the duration of the pre-insolvency relationship between the debtor and creditor. *Id.* at 224-25. Thus, "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." *Id.* at 225.

> FN3. The Court of Appeals for the Third Circuit substitutes "unusual" for "idiosyncratic" but otherwise fully endorses this definition. *Molded Acoustical,* 18 F.3d at 224.

*\*4* Applying these standards, I conclude that Cherrydale made the First Half Payment in the ordinary course of its business with Brown. I also conclude Cherrydale made the payment according to the ordinary business terms in its industry.

Brown enjoyed an enduring and stable pre-insolvency relationship with Cherrydale. During this time, like other salespeople, Brown routinely received salaried draws, First Half Payments and Year End Payments. His 1999 and 1998 First Half Payments were for the same amount. The increase of the draws from $25,000 to $50,000 over four years is consistent with increased earnings. It is not so extraordinary as to suggest Brown manipulated his draw in anticipation of Cherrydale's financial decline.

I do not find the fact Brown based the amount of his First Half Payment on tax considerations relevant. Brown's draw against his earned commissions at the beginning of the calendar year strikes me as a normal practice given that Cherrydale's sales occur mostly in September through December and that its fiscal year ends in July. There is no evidence to suggest Brown used economic pressure to exert an unusually large payment, or somehow procured an unfair advantage from Cherrydale over other creditors. A comparison of the timing of the First Half Payment to the past payment history between the parties shows Cherrydale made the 1999 payment according to a long standing practice, i.e., it was business as usual between the parties.

I do not believe Brown's discretion in determining the amount of the First Half Payment is probative of whether the payment is in the ordinary course of his dealings with Cherrydale. The relevant inquiry is whether Cherrydale has an established practice of making such payments, discretionary or otherwise. *Accord Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739, 743 (6th Cir.1989) ("Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 4
Not Reported in B.R., 2001 WL 1820323 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820323 (Bankr.D.Del.))**

The Committee seems to infer that the First Half Payment is an unearned advance akin to a loan because Cherrydale does not finalize actual commissions due until the end of its fiscal year. Even if this distinction is relevant for purposes of § 547(c)(2), I disagree with the characterization. It seems to me that the formula used to calculate the maximum available draw at the beginning of the calendar year actually ensures that the First Half Payment does not exceed earned commissions on sales for which Cherrydale was paid by its customers, adjusted downward for expenses and salary advances. Thus, the First Half Payment is a draw on earned commissions, not an advance on projected earnings. If Brown had terminated employment immediately after receiving his First Half Payment, he would have been entitled to keep the payment in full. Accordingly I find no merit in the Committee's argument that Cherrydale's practice of finalizing commission calculations in July renders the First Half Payment outside the ordinary course of business.

*5 Turning to the objective standard of § 547(c)(2)(C), I find the undisputed evidence establishes that the First Half Payment was made according to ordinary business terms. The Committee argues that Brown produced no evidence of the relevant industry standard. I disagree. Brown submitted an affidavit from Cherrydale's CFO with many years of experience with Cherrydale and within the industry. I cannot think of a better witness. At trial, the CFO would be qualified to testify on the subject matter, regarding both the industry standard in terms of competitor practices and the practice between the parties. Here, the CFO stated that based on his direct knowledge, draws on earned commissions such as the First Half Payment are standard in the industry.

The Committee has offered no contrary evidence. It does not even allege that the industry standard is something other than that described in the affidavits. The Committee cannot survive Brown's properly supported summary judgment motion by resting on mere allegations or denials; it must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Because Brown's affidavits are unrebutted, I find them sufficient to establish the relevant industry standard. *See Unsecured Creditors' Comm. v. CBA Indus. (In re Color Tile, Inc.),* 239 B.R. 872, 874 (Bankr.D.Del.1999) (finding creditor's undisputed affidavits sufficient to establish industry standard); *accord McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.),* 185 B.R. 103, 114- 15 (Bankr.E.D.N.Y.1995) (finding that creditor established elements of § 547(c)(2) and noting that "self-serving testimony may suffice to prove what 'ordinary business terms' are for a particular industry when there is no evidence to the contrary").

The Committee also argues that Brown's failure to offer evidence of an industry standard exclusive of the parties' course of dealings is fatal to his "ordinary course of business" defense. [FN4] I am not persuaded that the cases on which the Committee relies are relevant here. *See Sacred Heart Hosp. of Norristown v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hospital of Norristown),* 200 B.R. 114 (Bankr.E.D.Pa.1996); *Official Comm. Of Unsecured Creditors v. Sabrina (In re RML, Inc.),* 195 B.R. 602 (Bankr.M.D.Pa.1996).

> FN4. As indicated above, to the extent the Committee attacks the *sufficiency* of Brown's evidence, I find Howard Lightstone's unrebutted affidavit on ordinary business terms within Cherrydale's industry adequate.

At issue in both *Sacred Heart Hospital* and *RML, Inc.* is the question of which industry standard establishes "ordinary business terms" where two possible industry standards exist--that of the creditor or that of the debtor. This issue arises where the creditor is a supplier or trade creditor of the debtor. The emerging legal view is that § 547(c)(2)(C) requires objective proof that the disputed payments are "ordinary" in relation to the prevailing standards in the *creditor's* industry. *Midway Airlines,* 69 F.3d at 799. As a practical matter, this prevents the creditor from satisfying § 547(c)(2)(C) indirectly by using its own relationship with the debtor to prove the existence of a unified industry standard. *Id.* at 797. Because courts following this view require the creditor to reference some external data, usually relating to the practices of its competitors, the creditor's failure to proffer evidence exclusive of its own course of dealing with the debtor is fatal.

*6 In *Sacred Heart Hospital,* for example, the creditor, a heating, ventilation and air-conditioning contractor at the debtor's hospital, attempted to establish "ordinary business terms" by relying solely on evidence of its business relationship with hospitals. 200 B.R. at 115-16. The court found this inadequate. It held that the proper focus under § 547(c)(2)(C) was on ordinary business terms within the *creditor's* industry, not within that of the debtor. *Id.* at 118-19. Accordingly, it held the contractor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00593-GMS   Document 52-2   Filed 08/15/2005   Page 6 of 6

Not Reported in B.R.                                                                                                    Page 5
Not Reported in B.R., 2001 WL 1820323 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820323 (Bankr.D.Del.))**

failed to meet its burden under § 547(c)(2) because the creditor had confined its objective evidence to only the debtor's industry. *Id.* at 119; *accord In re RML, Inc.,* 195 B.R. at 616 (holding that creditor's failure to proffer evidence exclusive of parties' course of dealing fatal under § 547(c)); *see also Lawson v. Ford Motor Co. (In re Roblin Indus.),* 78 F.3d 30, 43 (2d Cir.1996) ("[T]he behavior of the parties cannot be sufficient in and of itself to sustain the creditor's burden of proof with respect to ordinary business terms in the industry").

The question of which industry standard to apply, however, does not arise where the creditor and debtor are in the same industry. This is, of course, the case where the creditor is the debtor's employee. Both parties are within the same industry, i.e., that of the employer. Thus, where the debtor is the employer, the only relevant industry is that of the debtor. It follows that the employee as creditor may establish "ordinary business terms" under § 547(c)(2)(C) in reference to the debtor's industry.

Because there is only one industry at issue in the present controversy, I do not believe the evidentiary concerns in *Sacred Heart Hospital* or *RML, Inc.* are relevant here. Brown's evidence in the form of the CFO's affidavit references compensation terms other than his own in Cherrydale's industry. This suffices for § 547(c)(2)(C) under the facts of this case. My conclusion comports with the case I find most analogous to Brown's situation, *NIMI Sys ., Inc. v. Pillard (In re NIMI Sys., Inc.),* 179 B.R. 357 (Bankr.D.D.C.1995).

In *NIMI Systems,* the creditor, an executive employee of the debtor, received an annual bonus at the end of the calendar year but had the right to take draws against the bonus beginning in May. 179 B.R. at 363. The employee received four bonus draws totaling $6,666 in the 90 days preceding his employer's bankruptcy. *Id.* at 371. In the resulting preference action, the employee raised the "ordinary course of business" defense.

After concluding that the employee established the first two elements of the defense, the court held that the debtor paid the bonus draws according to ordinary business terms under § 547(c)(2)(C). The court reasoned that "[b]onuses are paid by well established companies in the industry on a monthly, quarterly or yearly basis. It follows that a bonus plan finally calculated at year-end and partially payable by way of a set draw amount on each of the two pay periods in a month is not so at variance with the range of payment terms prevailing in the industry such as to be non-ordinary business terms." *In re NIMI Sys.,* 179 B.R. at 373. The court noted it "heard exceedingly weak evidence of the ordinary payment terms prevailing in the entire industry," but was nevertheless satisfied based on the employee's "work experience at other firms and the offers he received from other firms that the bonus draws were paid according to ordinary business terms." *Id.*

**\*7** The terms of Brown's compensation from Cherrydale are analogous to that of the employee in *NIMI Systems* and I think its conclusion under § 547(c)(2)(C) *a propos.* There simply is no evidence that Cherrydale's practice of paying its salespeople on earned commissions biannually, once as a draw, is at variance with the range of payment terms available in Cherrydale's industry. All the evidence, albeit sparse, is to the contrary. *See Molded Acoustical,* 18 F.3d at 223 ("[t]he purpose of [§ 547(c)(2) ] is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section [which is] to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy") (citations omitted).

CONCLUSION

For the reasons set forth above, I hold that Brown has met his burden under § 547(c)(2). Cherrydale incurred and paid the First Half Payment in the ordinary course of its business relationship with Brown. Cherrydale also made the First Half Payment according to ordinary business terms. Summary judgment in favor of Brown is appropriate.

ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the motion (Doc. # 11) of defendant Jerry Brown for summary judgment is GRANTED. The cross-motion (Doc. # 14) of plaintiff The Official Committee of Unsecured Creditors for the Use and Benefit of the Bankruptcy Estate of Cherrydale Farms, Inc. is DENIED.

Not Reported in B.R., 2001 WL 1820323 (Bankr.D.Del.)

END OF DOCUMENT