# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
INACOM CORP., on behalf of  )
All affiliated Debtors,     )
                            )
              Plaintiff,    )
                            )   Civil Action
v.                          )   No. 04-593GMS
                            )
INGRAM ENTERTAINMENT, INC., )   Adversary Case
Successor in interest to    )   No. 02-03960PIW
NASHVILLE COMPUTER          )
LIQUIDATORS,                )
                            )
_____Defendant.___)
```

DRAFT

DEPOSITION OF STEVEN GADSEY

August 3, 2005

Taken on Behalf of the Plaintiff

---

APPEARANCES:

For the Plaintiff:   Hon. Jeffrey P. Nolan
                     10100 Santa Monica Blvd.
                     11th Floor
                     Los Angeles, CA  90067

For the Defendant:   Hon. Jonathan P. Hersey
                     650 Town Center Drive
                     4th Floor
                     Costa Mesa, CA  92626

---

MORGAN REPORTING SERVICE
3352 Parsons Street
Murfreesboro, TN  37127-6427
(615) 890-7317
Reported by:  Marilyn Gorski, CCR #0174

Page 2

      The deposition of STEVEN L. GADSEY, taken on behalf of the Plaintiff and taken pursuant to notice on August 3, 2005, beginning at approximately 10:00 a.m., at Two Ingram Blvd., Lavergne, Tennessee, pursuant to stipulations of counsel.

      S T I P U L A T I O N S

      It is agreed that the court reporter, being a notary public for the State of Tennessee, may swear the deponent, take the deposition on the Stenograph shorthand machine and afterwards reduce the same to typewriting when it may be used for all purposes provided by the Federal Rules of Civil Procedure governing depositions.

      It is further agreed that the reading of the completed deposition by the deponent and the signature of the deponent are not waived.

1  Q.  And computer products, would that be hardware or software or both?

3  A.  Primarily hardware.

4  Q.  What -- if you could tell me, what position did you take next after your promotion?

7  A.  Sales cost accounting manager.

8  Q.  How long were you sales and cost accounting manager?

10 A.  Two years.

11 Q.  Until approximately 1989?

12 A.  Right.

13 Q.  Can you give me a sketch of what your job duties and responsibilities were as a sales and cost accounting manager?

16 A.  Monitored the daily costs related to the book, video, and computer products to ensure that the monthly reporting of those product lines was correct.

20 Q.  And you said the book and video products?

22 A.  And computer.

23 Q.  And computer. Same question as the prior topic you were on: From a lay person's perspective, can you just tell me, what does

Page 58

1  given to Tech Data?
2      A.    No, I do not.
3      Q.    Any other groups that Nashville
4  Liquidators was selling to other than what
5  you've been kind enough to testify to already?
6      A.    They did have a store where they
7  did sell to the public there at the office.
8      Q.    That was just kind of come in,
9  cash, get the equipment?
10     A.    Yes.
11     Q.    Can you tell me, in this 1999-2000
12 time frame, who were the competitors of
13 Nashville Liquidators?
14     A.    A company called Matrix, BLT, Tech
15 Express.  And their name has been changed to
16 Resilien now.
17     Q.    Resilien Logicare?
18     A.    Logicare.
19     Q.    Was Pincor a competitor?  In some
20 instances, I've heard of companies buying
21 product and also selling product to those two
22 entities, the same entity.
23     A.    Uh-huh.
24     Q.    Do you know whether or not
25 Nashville Liquidators not only sold product to

```
 1   performing that you haven't had a chance to
 2   perform before you render your expert opinions?
 3              MR. HERSEY:  Same objection.  You
 4       can answer.
 5       A.     No.
 6       Q.     Can you tell me -- with regards to
 7   industry standards, you've been designated on
 8   the topic of rendering an opinion on industry
 9   standards.  Can you tell me what your opinion
10   is that you'll render at time of trial?
11              MR. HERSEY:  I'll object to vague
12       and ambiguous.
13       A.     Well, it's based on the documents
14   that I've looked at.
15       Q.     Before we get to the documents,
16   what is your opinion with respect to Nashville
17   Liquidators and the industry standards in this
18   case?
19              MR. HERSEY:  Same objection.
20       A.     I think there really wasn't a
21   standard, a set standard.  Are you referring to
22   payment terms or what?
23       Q.     Correct.  I'm referring to the
24   payment terms that were issued by Nashville
25   Liquidators to a customer such as Ingram.
```

Page 103

```
 1      A.      My understanding was there were no
 2  standard terms.
 3      Q.      And when you're referring to no
 4  standard terms, you're referring to no standard
 5  payment terms in the industry, in what
 6  industry?
 7              MR. HERSEY:  Objection,
 8          mischaracterizes the testimony.  His
 9          testimony was limited to NCL's terms.
10  BY MR. NOLAN:
11      Q.      Is that accurate?
12      A.      To NCL?
13      Q.      Correct.
14      A.      Yes.
15      Q.      So to make sure I understand you,
16  you're saying that NCL, Nashville Computer
17  Liquidators, payment terms in the 1999 to 2000
18  time frame, they were not set or they were not
19  a standard term?
20      A.      There was no standard term.  They
21  varied among customer.
22      Q.      Okay.  And they varied among
23  customers of NCL?
24      A.      Yes.
25      Q.      You're comfortable if I use NCL
```

Case 1:04-cv-00593-GMS   Document 58-3   Filed 08/15/2005   Page 8 of 11

Page 105

1   they range from 15 to 60 days.
2       Q.      And those were the terms that you
3   saw on Mr. Gollin's report?
4       A.      Yes.
5       Q.      And is it still your testimony that
6   you don't know what the terms were for Matrix,
7   BLT, Tech Express?
8       A.      Yes.
9       Q.      For any of the competitors of NCL,
10  do you know whether or not they utilized a cash
11  discount for early pay?
12      A.      No.
13      Q.      Do you know whether or not any of
14  the competitors in the industry for NCL varied
15  their terms depending upon the size of the
16  customer?
17      A.      I don't know.
18      Q.      Other than what you know about
19  Resilien and Logicare, do you know whether or
20  not any of NCL's competitors in the 1999-2000
21  time frame had more stringent or more lenient
22  payment terms than net 30?
23      A.      No.
24      Q.      In the 1999 to 2000 time frame, do
25  you know whether or not any of NCL's

1  competitors had an average standard for late
2  payments before they escalated the collection
3  process?
4           MR. HERSEY:  Object to form.
5      A.   No.
6      Q.   In the 1999 to 2000 time frame, do
7  you know, Mr. Gadsey, what percentage of NCL's
8  competitors in the industry had their invoices
9  retired according to their standard terms?
10          MR. HERSEY:  Object to form.
11     A.   No.
12     Q.   Meaning in the 1999 to 2000 time
13 frame, a competitor of NCL might have standard
14 terms that were, say, net 30 days?
15     A.   Yes.
16     Q.   Is that fair?
17     A.   Yes.
18     Q.   Do you understand so far?
19     A.   Yes.
20     Q.   Okay.  Do you have any idea as to
21 any of NCL's competitors how many of their
22 invoices were retired according to their
23 standard terms in that time frame?
24     A.   I do have knowledge of Resilien's
25 average aging of invoices, what percentage was

1   telecommunications companies?
2       A.   Well, the telecommunications are
3   not necessarily computer distributors.
4       Q.   Do you know whether or not, in the
5   1999 to 2000 time frame, Comcast or any of the
6   other telecommunications companies sold
7   computers or computer accessories such as hard
8   drives or computer peripherals?
9       A.   I don't know if they did.
10      Q.   With respect to any of the
11  competitors of NCL in the 1999 to 2000 time
12  frame, did you ever perform any type of an
13  analysis of their payment terms and the
14  timeliness that their customers paid them?
15      A.   No.
16      Q.   Did you generate any notes or work
17  papers or scribble on any piece of paper in
18  your reviewing of Mr. Gollin's report?
19      A.   No.
20      Q.   With respect to your opinion that
21  there were no standard terms, that statement is
22  -- again, if I understand you correctly, is
23  referring to customers of NCL in the 1999 to
24  2000 time frame?
25      A.   Yes.

Page 118

1  N-15. Do you know what N-15 stand for?

2    A.    I believe it's net 15.

3    Q.    Mr. Gadsey, do you know whether or not any of the competitors of NCL in the 1999-2000 time frame had standard payment terms as to all customers as opposed to different terms for different customers?

8    MR. HERSEY: Object. Vague and ambiguous.

10    A.    No.

11    Q.    You do not know?

12    A.    (Nods head.)

13    Q.    Do you understand my question?

14    A.    Maybe you need to repeat it.

15    Q.    Okay. Somebody like BLT, do you know whether or not the payment terms for their invoices in 1999 or 2000 were the same as to all customers or might, in fact, be different depending upon the customer and the creditworthiness?

21    A.    I don't know. I don't know their credit terms.

23    Q.    Have you ever issued a publication or written any type of article concerning industry terms and in the computer sales,