# EXHIBIT B



```
UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                     Civ Act No.
                    Plaintiff,          04-148 GMS
          -against-                     Adversary No.
TECH DATA CORP.,                        02-03496 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                     Civ Act No.
                    Plaintiff,          04-582 GMS
          -against-                     Adversary No.
DELL COMPUTER CORPORATION,              02-03499 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                     Civ Act No.
                    Plaintiff,          04-583 GMS
          -against-                     Adversary No.
LEXMARK INTERNATIONAL, INC.,            02-03500 PJW
                    Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,                     Civ Act No.
                    Plaintiff,          04-593 GMS
          -against-                     Adversary No.
INGRAM ENTERTAINMENT, INC.,             02-03960 PJW
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
                    Defendant.
------------------------------------x
```

July 28, 2005

9:11 a.m.


Deposition of JASON FENSTERSTOCK


**Computer Reporting Incorporated** CRI

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

1          **J. Fensterstock**

2   thinking with Rich Whalen on issues, among others.

3          Q.   Did you personally perform any of the

4   tasks connected with the discounted cash flow

09:41:41  5   analysis?

6          A.   Yes.

7          Q.   What tasks were you involved with?

8          A.   Review of the discounted cash flow

9   analysis, review of the weighted average cost of

09:41:58  10  capital calculation, review of the Excel

11  spreadsheets, checking numbers, the way

12  professionals like I do, with back of the envelope

13  checks, to see that the numbers make sense from an

14  overall point of view, reviewing of the base data

09:42:25  15  to that data which was included in the Excel

16  spreadsheet that comprised the DCF analysis.

17         Q.   Did you, in the course of the tasks

18  you just described, review any of the source

19  documents?

09:42:49  20         A.   All of the source documents relative

21  to the discounted cash flow analysis, I located

22  through the discovery process, and provided to

23  Duff & Phelps personnel, and reviewed those

24  documents and the data in those documents for the

09:43:23  25  normal processes of review that one includes in a

1                    *J. Fensterstock*

2        DCF analysis.

3            Q.   In the course of that review, did you

4        select any of the numbers used from those source

09:43:43  5      documents in the DCF analysis?

6            A.   I'm not sure I understand your

7        question.

8            Q.   Okay.  Dollar amounts, in various

9        categories, were taken from source documents in

09:44:10 10      order to be used in your discounted cash flow

11       analysis, correct?

12           A.   Yes.

13           Q.   Did you personally select any of the

14       dollar amounts from the source documents, that

09:44:19 15      were to be used in the DCF analysis?

16           A.   No, I reviewed what was selected by

17       others.

18           Q.   Did you have any personal involvement

19       in the comparable company analysis that is set

09:44:37 20      forth in your May 2 report?

21           A.   Yes.

22           Q.   What was your involvement in that

23       regard?

24           A.   Through the discovery process, I

09:44:50 25      identified, through I think thousands and

**J. Fensterstock**

thousands of pages, that there were a number of entities that had looked at Inacom industry. These entities included -- not in any particular order, Compac, Goldman Sachs, Greenhill, Houlahan, Lokey, Deutsche Bank, and in the context of the Houlahan, Lokey work, there were independent, third party broker firm reports that were referred to in the Houlahan, Lokey work. I reviewed all of those, and I selected the universe of comparable companies that I saw Goldman Sachs looking at, Deutsche Bank looking at, Greenhill looking at, Houlahan, Lokey looking at, and some of the other brokerage firms looking at, and I provided that full universe to Duff & Phelps as the beginning base of their comparable company analysis.

Q. Did you perform any other tasks with respect to the comparable company analysis?

A. Yes.

Q. What other tasks?

A. I helped Duff & Phelps advise and clarify on the procedure that they would follow to reach the list of comparable companies that would be included in our report, dated May 2nd.

The younger persons on the Duff &

J. Fensterstock

2   A.   Yes.
3   Q.   Did you have that data available for
4   the separate service business of Inacom?
5   A.   No.
6   Q.   Is that one of the reasons you chose
7   to do the gross margin analysis?
8   A.   Yes, one of the reasons.
9   Q.   What were the other reasons?
10  A.   To serve as a check against all of the
11  other analyses we did, and because we had gross
12  margin data on the service business for Inacom for
13  16 quarters, ending with the quarter of the fourth
14  quarter of calendar -- fiscal 1999, for Inacom.
15  Q.   I'm going to bring us back to our
16  discussion of your role in the preparation of the
17  May 2 report.  The third methodology that you used
18  was comparable transaction analysis; correct?
19  A.   Yes.
20  Q.   What was your role, if any, with
21  respect to that analysis?
22  A.   I will admit that my role with respect
23  to that analysis was least intense, because it
24  does not require as much thinking as the other two
25  valuation processes in the following sense:  The

**J. Fensterstock**

  M&A transactions list, once you identify the industry and SIC codes that you are looking for, and the time frame, it is a computer run out of databases, with standard information that is provided out of the those databases for -- that is used in investment banking circles and valuation circles, and therefore it is really a reporting of data and much less -- it is really reporting of data, requires less thorough analysis than the discounted cash flow analysis or the comparable company analysis.

  Q. Did you have any role in the comparable transaction analysis?

  A. Only to review it, and to make sure that the universe that was being focused on, relative to the Inacom service business, was the universe that I would have focused on.

  Q. Did you make any changes to that universe, through your review?

  A. Did not have to.

  Q. Who was primarily responsible for the comparable transaction analysis?

  A. The Duff & Phelps side of the equation.

J. **Fensterstock**

Q. Was Mr. Whalen ultimately responsible at Duff & Phelps for that analysis?

A. Yes.

Q. Do you intend, at trial, to offer opinions with respect to all of the analyses in the May 2 report?

A. I suspect so, that's conjecture, since I suspect you are going to capitulate before trial.

Q. Let me ask it a different way then, and I always appreciate humor, believe me.

A. Forgive me for that indulgence.

Q. No forgiveness required. Assuming this matter proceeds to trial, do you expect to offer opinions with respect to all of these analyses in the May 2nd report?

A. Yes.

Q. To your knowledge, does Mr. Whalen hold any opinions with respect to the May 2 report?

A. Yes.

Q. Does he hold any opinions different than yours?

A. Not to my knowledge.