# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
INACOM CORP., on behalf of  )
All affiliated Debtors,     )
                            )
          Plaintiff,        )
                            )   Civil Action
v.                          )   No. 04-593GMS
                            )
INGRAM ENTERTAINMENT, INC., )   Adversary Case
Successor in interest to    )   No. 02-03960PIW
NASHVILLE COMPUTER          )
LIQUIDATORS,                )
                            )
          Defendant.        )
```

DEPOSITION OF STEVEN GADSEY

August 3, 2005

Taken on Behalf of the Plaintiff

---

APPEARANCES:

For the Plaintiff:    Hon. Jeffrey P. Nolan
                      10100 Santa Monica Blvd.
                      11th Floor
                      Los Angeles, CA  90067

For the Defendant:    Hon. Jonathan P. Hersey
                      650 Town Center Drive
                      4th Floor
                      Costa Mesa, CA  92626

COPY

---

**MORGAN REPORTING SERVICE**
3352 Parsons Street
Murfreesboro, TN  37127-6427
(615) 890-7317

Reported by:  Marilyn Gorski, CCR #0174

```
 1      Q.    Do you recall what Mr. Hamblin's
 2  middle name was?
 3      A.    No.
 4      Q.    How about Ms. Bills?
 5      A.    No.
 6      Q.    Do you know if either Mr. Hamblin
 7  or Ms. Bills went to another employer after
 8  they left Ingram?
 9      A.    Ms. Bills retired.  Mr. Hamblin
10  went to work for Lifeway Ministries.
11      Q.    What was your position following
12  assistant controller?
13      A.    Vice president of finance.
14      Q.    And how long did you hold the title
15  as vice president of finance?
16      A.    Until 2002.  It was changed to vice
17  president, financial services.
18      Q.    And how long were you vice
19  president of financial services following 2002?
20      A.    Until now.
21      Q.    That's your current title?
22      A.    Yes, sir.
23      Q.    Can you tell me generally what your
24  job duties and responsibilities were as vice
25  president of finance from 1998 to 2002?
```

1    A.    They were the same until 1999, when
2  I became responsible for the finance department
3  of Nashville Computer Liquidators.
4         MR. NOLAN:  Can you read that
5     answer back?
6         (Whereupon, the last answer was
7     read by the court reporter.)
8  BY MR. NOLAN:
9    Q.    And as of 1999, was Nashville
10 Computer Liquidators a subsidiary or
11 subdivision of Ingram Entertainment?
12   A.    Yes.
13   Q.    Do you know which one it was?
14   A.    Nashville Computer Liquidators was
15 a limited partnership.  Ingram Entertainment,
16 Inc., was a general partner.
17   Q.    Okay.  Thank you.  So can you tell
18 me what your job duties were generally from
19 1998 to 1999?
20   A.    They were the same as the previous
21 position.
22   Q.    So I know it is a generalization,
23 but the same as assistant controller with
24 respect to the accounting department, the
25 non-product AP department, and billing

```
 1   subsequently downsized?
 2        A.     We terminated the business in April
 3   of 2001.
 4        Q.     Was the name changed, or was it
 5   actually the business was -- the name and the
 6   business itself was terminated?
 7        A.     The business was terminated.  The
 8   name was changed from Nashville Computer
 9   Liquidators to Action International Marketing
10   Liquidators.  I don't really recall exactly
11   what the name was.
12        Q.     Was any of the business reassigned
13   to a different entity at Ingram?
14        A.     No.
15        Q.     Just totally got out of the
16   business all together?
17        A.     Yes.
18        Q.     Who did you go to work for as of
19   April of 2001?
20        A.     I continued to work for Jeff
21   Skinner.  I was an Ingram Entertainment
22   employee the whole time during that time frame,
23   and I reported to Jeff Skinner.
24        Q.     And Mr. Skinner works for Ingram
25   Entertainment?
```

```
 1      A.    The computer used by all the
 2  employees, sales reps, finance.
 3      Q.    Okay.  Is Mr. Willits still with
 4  Ingram?
 5      A.    No.
 6      Q.    Do you know if he went to work for
 7  another employer?
 8      A.    No, I do not.
 9      Q.    Do you know if he still lives in
10  Tennessee?
11      A.    I don't think he does.
12      Q.    Do you know where he went to?
13      A.    No, I don't.
14      Q.    Do you know what his middle name
15  was?
16      A.    No.
17      Q.    Was he married?
18      A.    No.
19      Q.    Peter Marcum, does he still work
20  for Ingram?
21      A.    No.
22      Q.    Do you know who he works for?
23      A.    He went in business -- he started
24  another business in Nashville that I don't
25  recall the name of.
```

```
 1   the time?
 2        A.    I think he was in his early
 3   thirties.
 4        Q.    You're 1961; right?
 5        A.    '59.  I'm 45 now.
 6              (Whereupon, an off-the-record
 7        conversation was held.)
 8              MR. NOLAN:  We can go back on the
 9        record.  Could you read the last answer?
10              (Whereupon, the last question and
11        answer were read by the court reporter.)
12   BY MR. NOLAN:
13        Q.    Was there any other representative
14   that you were aware of at Nashville Computer
15   Liquidators that had contacts with Inacom other
16   than Mr. Garzolie?
17        A.    Not that I'm aware of.
18        Q.    Would you mind if I called it
19   Nashville Liquidators instead of Nashville --
20   the formal name?
21        A.    Sure.
22        Q.    You'll know what I'm talking about?
23        A.    Yes.
24        Q.    What was the protocol at Nashville
25   Liquidators in the accounts receivable
```

```
 1   department in 1999 if a customer was falling
 2   behind in payments?
 3        A.    They would notify the sales
 4   representative.
 5        Q.    Okay.  What would they notify the
 6   sales representative about?
 7        A.    If there was a customer who was
 8   falling behind on payment of invoices.
 9        Q.    Who would give that notification
10   from the finance department?  Would that be
11   you?
12        A.    There was an accounts receivable
13   clerk that gave that information to the sales
14   representative.
15        Q.    In 1999, who was that accounts
16   receivable clerk?
17        A.    I don't recall the name.
18        Q.    When that information was given to
19   the sales representative for that account,
20   would they generally -- were there any specific
21   instructions given?
22        A.    No.  They only gave the sales
23   representative -- my understanding was they
24   would have given the sales representative
25   invoice number, dollar amount, invoice date,
```

1  that type of information.
2     Q.    And that would be given to the
3  sales representative to follow up with the
4  customer on payment?
5     A.    Yes.  That's my understanding, yes.
6     Q.    Were there scenarios in 1999 at
7  Nashville where if that was -- if that protocol
8  that you just mentioned didn't resolve the
9  outstanding amount, what would be the next
10 scenario?
11    A.    My understanding is that it would
12 be discussed with management at the time of the
13 delinquency.
14    Q.    Management of the customer?
15    A.    Management of Nashville Computer
16 Liquidators.
17    Q.    So if it wasn't resolved by the
18 salesperson, then it would be brought up to the
19 management of Nashville Liquidators?
20    A.    To the president.
21    Q.    Okay.  Was there a protocol for a
22 time frame that would be allowed to transpire
23 before that would happen?
24    A.    I don't recall there being a time
25 frame.

1  Q. Was there any type of like informal
2  or formal escalation process as far as in the
3  finance department in trying to collect
4  outstanding amounts?
5  A. No, not really. Again, the sales
6  reps were responsible for collecting the debts.
7  Q. Would the finance department ever
8  get involved if the salesperson was
9  unsuccessful in collecting the debt?
10 A. Not that I recall.
11 Q. What happened if the salesperson
12 came back and said the customer refuses to pay
13 or they can't pay? Would there be any actions
14 taken by the finance department?
15         MR. HERSEY: Don't guess.
16 A. I don't recall really what the
17 procedure was. I mean, I just don't remember.
18 Q. Have you ever heard the term
19 shipping hold before?
20 A. I'm sorry. Could you repeat that?
21 Q. Sure. Have you ever heard the term
22 shipping hold before?
23 A. No.
24 Q. When you were with Nashville
25 Liquidators, did you ever place a customer on

```
 1   shipping hold because they were viewed as a
 2   risk to ship additional product to?
 3        A.   We may have.
 4        Q.   If someone was to be placed on
 5   shipping hold in 1999, who would have made that
 6   decision at Nashville Liquidators?
 7        A.   The president.
 8        Q.   And would the president make that
 9   decision in concert with anyone from the
10   finance department?
11        A.   No.
12        Q.   As part of your duties as VP of
13   finance at Nashville Liquidators, did you give
14   the president a daily running of accounts
15   receivables?
16        A.   I did not.
17        Q.   Did somebody under your direction
18   or somebody under your control give the
19   president a daily running of outstanding
20   accounts receivables?
21        A.   The controller may have. I don't
22   remember if it was daily or not.
23        Q.   If it wasn't daily, could it be
24   weekly?
25        A.   It could have been.
```

1    Q.    Do you remember as you sit here today ever seeing a report such as that in 1999 or 2000?

4    A.    Yes. I'm sure I did.

5    Q.    But the same response, you're not sure if it was daily, weekly, or monthly?

7    A.    I did not look at it daily, no.

8    Q.    Do you know, though, whether or not the report, if it wasn't prepared daily, do you know if more likely than not it would have been prepared weekly as opposed to a different time frame?

13   A.    Yes, probably would have been weekly.

15   Q.    In the 1999 time frame, who was the largest customers of Nashville Liquidators?

17   A.    Inacom, Pincor, Ingram Micro.

18   Q.    Would it be in that order?

19   A.    I believe so.

20   Q.    Did you have any involvement in setting credit limits that Inacom, Pincor, or Ingram Micro would be allowed to purchase product from Nashville?

24   A.    I believe that was established by the president and by the management of Ingram

1  Entertainment.
2     Q.   I'm sorry. It was the president
3  and the --
4     A.   Management of Ingram Entertainment.
5     Q.   In the 1999 time frame, based on
6  your position at Nashville Liquidators, was
7  product sold to customers such as Inacom on
8  credit?
9     A.   Yes.
10    Q.   Meaning the product would be
11 shipped, and then the customer such as Inacom
12 would pay it at a certain time after the
13 shipment?
14    A.   Yes.
15    Q.   Do you recall what the payment
16 terms were for Inacom in the 1999 time frame?
17    A.   Yes. I believe it was net 30.
18    Q.   And what is net 30 meaning?
19    A.   The invoice is due 30 days from
20 invoice date.
21    Q.   Do you recall whether or not
22 Nashville Liquidators employed any type of
23 early-pay discount in the 1999 time frame?
24    A.   No. I don't recall anything like
25 that.

```
 1        Q.     Just so I make sure my question is
 2   clear, something like, you know, net 15, you
 3   know, 1 percent discount, net 30 for the
 4   remainder?
 5        A.     I don't recall anything like that.
 6        Q.     Okay.  Were the payment terms
 7   net 30 days, were those established by
 8   Nashville Liquidators?
 9               MR. HERSEY:  Object to form.
10        A.     I believe so.
11        Q.     And do you have any recollection in
12   the 1999 time frame of whether or not Nashville
13   Liquidators' terms for payment of outstanding
14   invoices was uniform to all customers?
15        A.     I don't think they were.
16        Q.     So you believe that other customers
17   in the 1999 time frame of Nashville Computers
18   or Nashville Liquidators had different payment
19   terms?
20        A.     Yes.
21        Q.     And the different terms in 1999, do
22   you know if it was based on any type of formula
23   or tiering system?
24        A.     I believe it was based on the
25   customer.  And, again, it was a management
```

```
 1   decision by the president and by the management
 2   of Ingram Entertainment, Inc.
 3        Q.    Were you ever part of any of the
 4   discussions with the management at Ingram
 5   Entertainment, Inc., or with the president of
 6   Nashville Computers as to establishing payment
 7   terms for different clients?
 8        A.    I don't recall being involved in
 9   any of those conversations.
10        Q.    In the 1999 time frame, how would
11   you learn as to what customers' payment terms
12   were as established by Nashville Computers?
13        A.    I would have been instructed by the
14   president their terms.  We would have set them
15   up in the accounting system that we utilized.
16        Q.    So you would have learned what the
17   different customers' terms were when you set
18   the account up in the accounting finance
19   department?
20        A.    Yes.
21        Q.    As far as the clients of Nashville
22   Computers or Nashville Liquidators -- I've
23   messed up now, whether I was referring to it as
24   Nashville Computers or Nashville Liquidators.
25             MR. HERSEY:  Is it easier to use
```

```
 1        NCL?
 2             MR. NOLAN:  Probably not.
 3   BY MR. NOLAN:
 4        Q.   Can you tell me, in the 1999 time
 5   frame, did Nashville Liquidators have a
 6   different tiering of customers like the big
 7   customers might have been Inacom, Ingram Micro,
 8   then some smaller ones, and then another group
 9   that were even smaller?  Do you have that
10   organized in your mind in a certain way?
11        A.   The only thing I remember is we had
12   e-commerce customers such as Buy.com, Amazon,
13   and we had our traditional customers such as
14   Inacom, Pincor, Ingram Micro.  That was the
15   only distinction I recall making.
16        Q.   The e-commerce, what type of group
17   is this?
18        A.   Web sales.
19        Q.   And they would be actually buying
20   the same type of product that somebody like
21   Inacom or Pincor would be buying?
22        A.   They could.
23        Q.   Do you recall as we sit here today
24   whether or not any of the terms with any of the
25   other customers of Nashville Liquidators were
```

```
 1   document.
 2        A.     Okay.
 3               (CONTINUANCE OF NOTICE WAS MARKED
 4               AS EXHIBIT 1.)
 5        Q.     Before I ask you a question about
 6   Exhibit 1, I would like to just ask you one
 7   other question on that last topic we were on.
 8               Is it a fair statement, Mr. Gadsey,
 9   that if Ingram Entertainment, which means
10   primarily the management at that entity or the
11   salesperson, changed the terms to Inacom
12   because they were being delinquent on an
13   account, that you would not have been privy to
14   that change of circumstance, or is it possible
15   you were privy to that?
16        A.     It's possible I would have been
17   privy to that.
18        Q.     Do you know whether or not that
19   actually occurred in early 2000?
20        A.     That the terms changed?
21        Q.     Right.
22        A.     They may have changed from 30 days
23   to 45 days.
24        Q.     And why do you say that?
25        A.     Because we did change our
```