1  accounting system in the spring of 2000. And
2  we had 45 days, I believe, on some of the
3  invoices to Inacom.
4    Q.    If it did change to 45 days, the
5  terms in the spring of 2000, do you know if
6  that was attributable to a change in the
7  accounting system or the fact that Compaq had
8  purchased the assets of Inacom?
9    A.    I'm not sure why it changed.
10   Q.    And are you sure that it actually
11 changed in the spring of 2000?
12   A.    I believe it did.
13   Q.    Is there any document -- you were
14 referencing a document. Did you get that
15 understanding from reviewing documents in
16 preparation for your deposition?
17   A.    I think so.
18   Q.    I'm asking that as opposed to you
19 sitting here today and having an independent
20 recollection of that occurring in the spring of
21 2000.
22   A.    I don't have a recollection from
23 the spring of 2000. It seems like I do
24 remember seeing it on an invoice.
25   Q.    Do you want to take a look at this

```
 1   you looked in the Inacom file, there were
 2   invoices for the February 2000 time frame?
 3        A.    There may be.  I don't specifically
 4   remember looking for those.
 5        Q.    Do you recall if you saw the
 6   request to produce documents before you looked
 7   for documents?
 8        A.    I don't remember.
 9        Q.    Let me show you a document.  It's
10   IE0038.  There at the bottom of the page is an
11   Invoice 00006613.
12        A.    Uh-huh.
13        Q.    Do you see that?
14        A.    Yes.
15        Q.    There's a column that says due
16   date.  Can you show me what would be the due
17   date for that invoice?
18        A.    It looks like February 21st.
19        Q.    What would be the date of the
20   invoice?
21        A.    February 21st.
22        Q.    Do you have any recollection in the
23   1999 to 2000 time frame of Inacom being changed
24   to a COD account?
25        A.    No.
```

```
 1        Q.      Is it possible that could have
 2   occurred?
 3        A.      It may have occurred.
 4        Q.      Do you recall any other accounts
 5   that you were -- while you were vice president
 6   of finance, that Nashville Liquidators changed
 7   a customer to a COD account?
 8        A.      They may have.
 9        Q.      If they had, that being Nashville
10   Liquidators, had changed a customer to a cash
11   on delivery account in the 1999-2000 time
12   frame, what would that be attributable to?
13        A.      It could be attributable to the
14   financial condition of the customer.
15        Q.      I'm sorry, the what?
16        A.      The financial condition of the
17   customer and their ability to pay.
18        Q.      Meaning like questionable financial
19   condition and a greater risk of failure to pay?
20        A.      Yes.
21        Q.      And who would make that decision at
22   Nashville Liquidators in that time frame?
23        A.      It would be the sales
24   representative, the president, and the
25   management of Ingram Entertainment.
```

```
 1      A.   No.
 2      Q.   Let me show you the document that
 3 was attached to the complaint. Maybe you saw
 4 that.
 5      A.   I remember seeing this.
 6      Q.   The letter dated December 19, 2001?
 7      A.   Yes.
 8      Q.   Did you ever have an opportunity,
 9 Mr. Gadsey, to research the payments that
10 Inacom alleged were preferential transfers?
11           MR. HERSEY:  Object to form.  It's
12      vague and ambiguous.  You can answer.
13      A.   I believe I did.
14      Q.   Was there ever any issue, based on
15 your research, that Nashville Liquidators did
16 not receive the funds that are referenced in
17 this letter dated December 19, 2001?
18      A.   I believe we did receive those
19 funds.
20      Q.   I'm going to ask you to look again
21 at Exhibit 1, if you could.
22      A.   Okay.
23      Q.   If you can, go to page 1.  As part
24 of asking you to be here today, we noticed for
25 deposition the person most knowledgeable -- and
```

```
 1   I wanted to just go through these categories of
 2   examination and ask you if you were the person
 3   most knowledgeable in these topics.
 4        A.   Yes.
 5             MR. HERSEY:  Interpose an
 6        objection.  Calls for a legal conclusion.
 7        You can ask him if he's the most
 8        knowledgeable person here, but I don't
 9        agree that's the legal standard we're
10        required to comply with.
11   BY MR. NOLAN:
12        Q.   Category Number 1 -- let me ask it
13   this way:  Do you have knowledge of any of the
14   communications between Inacom and Compaq with
15   respect to Compaq's purchase of the
16   distribution division of Inacom?
17        A.   No.
18        Q.   If you would, look at the second
19   category.  Did you or do you have any knowledge
20   concerning the terms of the asset sale between
21   Inacom and Compaq that took place in February
22   of 2000?
23        A.   No.
24        Q.   If you would, look at Category 3
25   for me.  As part of learning of this
```

1  litigation, did you perform any type of
2  research on the checks that were alleged to
3  have been sent by Inacom and received by
4  Nashville Liquidators in the preference period?
5      A.    Yes.
6      Q.    And I believe your previous
7  testimony was that you had -- it was your
8  belief that those checks that were alleged to
9  have been sent to Nashville were, in fact,
10 received by Nashville; is that correct?
11     A.    Yes.
12     Q.    Did you perform any other type of
13 research concerning those checks that were
14 identified by Inacom as being forwarded to
15 Nashville Liquidators?
16         MR. HERSEY:  Object.  Vague and
17     ambiguous.  You can answer.
18     A.    I traced it to the bank statement
19 as being deposited and clearing.
20     Q.    The checks that were alleged to
21 have been received by Nashville Liquidators,
22 were they actually received, to your knowledge,
23 at the bank, or were they received by Nashville
24 Liquidators and then deposited?
25     A.    By Nashville Liquidators and then

```
 1   deposited.
 2        Q.    So in the 1999 time frame, checks
 3   were sent directly to Nashville Liquidators as
 4   opposed to a lockbox?
 5        A.    Yes.
 6        Q.    And what was the common practice in
 7   1999 as to when checks would be deposited?
 8        A.    Normally, the same day that they
 9   were received or the day after.
10        Q.    So would you have like a check run
11   every day to the bank, or would it be a certain
12   day every week, or was there any type of
13   routine?
14        A.    I remember, every day, there being
15   a deposit made at the bank.
16        Q.    And who at Nashville Liquidators
17   would actually receive and prepare the deposit
18   slip for the bank?
19        A.    I believe it was our receptionist.
20        Q.    And who was your receptionist in
21   1999?
22        A.    Stacey.  I don't remember her last
23   name.
24        Q.    Is she still with Ingram?
25        A.    No.
```

1   Q.   Would her name be on any of these
2 deposit slips?  If you would look at IE0143, is
3 that a deposit slip that you were referring to
4 earlier in your testimony?
5   A.   Yes.
6   Q.   So would that be something that was
7 prepared by Nashville, or would that be
8 something that would be prepared by the bank?
9   A.   By Nashville.
10   Q.   So you had like a software program
11 that you would actually enter the information
12 into and it would print out?
13   A.   It's an Excel spreadsheet.
14   Q.   You can't tell anywhere from that
15 document who prepared the deposit slip?
16   A.   No.
17   Q.   And during the 1999-2000 time
18 frame, was SouthTrust Bank the bank that
19 Nashville actually deposited customer funds in?
20   A.   Yes.
21   Q.   Any other banks that Nashville
22 utilized?
23   A.   No.
24   Q.   Did you ever perform any type of
25 analysis to determine whether or not

```
 1   Nashville's invoices were paid by Inacom as
 2   opposed to Compaq?
 3        A.   Yes.
 4        Q.   What did you do in that regard?
 5        A.   I looked at our trial balance and
 6   noted whether it was paid by an Inacom check or
 7   a Compaq check, the invoice.
 8        Q.   And how could you tell if it was
 9   paid by a Compaq check?
10        A.   It was signed by Ben Wells, and it
11   did not have a name of a company on the check.
12   And some of the checks had the letter that we
13   looked at explaining the sale of Inacom to
14   Compaq attached to it.
15        Q.   Were you ever able to make a
16   determination as to which invoices by Nashville
17   Liquidators were paid by a held check from
18   Inacom?
19        A.   I believe so.
20        Q.   And how did you do that or how did
21   you determine that?
22        A.   By looking at the date of the check
23   and the date that we deposited it.
24        Q.   And what were you able to decipher
25   from those two pieces of information?
```

1    A.    There was a wide range of days in
2  between.
3    Q.    Between the date of the invoice and
4  the date the check was issued?
5    A.    The date of the check and the date
6  the check was deposited.
7    Q.    So when you say -- the date of the
8  check would be the actual date that's on the
9  upper right-hand corner of the check?
10   A.    Yes.
11   Q.    And the date deposited would be the
12 date that Nashville deposited the check?
13   A.    Yes.
14   Q.    And based upon the longer period of
15 time, you determined those were held checks?
16   A.    Yes.
17   Q.    And based on your review of these
18 check ledgers and such, did you note that the
19 held checks were the checks that matched up to
20 the checks or the invoices that Inacom alleged
21 were due and owing in this lawsuit?
22         MR. HERSEY:  Objection.  Lacks
23      foundation, vague and ambiguous.  You can
24      answer.
25   A.    I believe so.

1    Q.    Based on your review and research,
2  did you note any held checks paying any
3  Nashville invoices in the preference period?
4    A.    I believe so.
5    Q.    Did you note a particular time
6  frame in the pre-preference period that held
7  checks paid in the account?
8    A.    Can you repeat the question one
9  more time?
10    Q.    Yeah. Do you recall a specific
11  time frame in the pre-preference period where
12  you noted that Inacom had issued a held check
13  on a group of Nashville invoices?
14    A.    I don't know right offhand. I
15  would have to look at the documents.
16    Q.    Okay. Would it help the most to
17  use the ledger, or do you want me to hand you
18  the whole group?
19        MR. HERSEY: Do you mind if I help
20    him out here. I think he's looking at the
21    wrong ledger. It's in the other
22    production, not this set, which I have a
23    copy that I can show him.
24        MR. NOLAN: What's the Bates stamp
25    number?

```
 1            MR. HERSEY:  It starts at 512.
 2       This one has the check date on it.
 3       A.      If you look at the first invoice,
 4  3081, check date is August 10, 1999.  The
 5  deposit date is August 23rd.  So even with a
 6  mail date of two to three business days --
 7  again, we deposit the checks as soon as we
 8  receive them.  So that check was probably held
 9  ten days, nine or ten days, would be my
10  understanding.
11       Q.      And did anyone at Inacom ever
12  explain to you what a held check was at Inacom?
13       A.      No.
14       Q.      Did you ever learn from anyone else
15  at Nashville that they had had a discussion
16  with someone at Inacom who described what a
17  held check was?
18       A.      No.
19       Q.      Would you have any knowledge
20  concerning any communications between Inacom
21  and Nashville Liquidators concerning held
22  checks or outstanding accounts receivable?
23       A.      No.
24       Q.      I think that's Category 7 on the
25  exhibit.
```

```
 1        A.      Okay.
 2        Q.      So the answer to the question is,
 3   you don't have any knowledge concerning
 4   Category 7?
 5        A.      I had no communications.  The sales
 6   rep may have had some communications.
 7        Q.      But you don't have any knowledge on
 8   the Ingram side from talking with that sales
 9   rep?
10        A.      No.
11        Q.      I think we just talked about
12   Category 4.  You do have knowledge concerning
13   the handling of payments from Inacom from
14   January 1, 1999 to June 16, 2000?
15        A.      Are we on 4 or 8?
16        Q.      We're on 4.
17        A.      Could you repeat the question,
18   please?
19        Q.      Sure.  For Category 4, you do have
20   information concerning Category 4; correct?
21        A.      Yes.
22        Q.      That was your testimony concerning
23   the receipt of payments and the receptionist
24   logging it in?
25        A.      Yes.
```

```
 1        Q.     Looking at Category 6, are you the
 2   person most knowledgeable at Ingram with
 3   respect to Nashville's procedures regarding
 4   accounts receivable collections?
 5        A.     Yes.
 6        Q.     And you've testified a little bit
 7   this morning about accounts receivable and how
 8   that decision to escalate was made by -- you
 9   can correct me if I'm wrong -- the management
10   as well as the salesperson on the account?
11        A.     Yes.
12        Q.     Do you have anything else to add
13   besides what you've testified to this morning?
14               MR. HERSEY:  Objection.  Vague and
15        ambiguous.
16        A.     No.
17        Q.     With respect to Category 8, if you
18   would look at that, please, is it a fair
19   statement, based on your testimony here earlier
20   today, that you don't have any direct knowledge
21   concerning contact with Inacom to collect on
22   accounts receivables?
23        A.     Yes.
24        Q.     Is it a fair statement that you are
25   the person most knowledgeable at Nashville
```

1   Liquidators concerning the receipt of payments
2   from Inacom?
3       A.    Yes.
4       Q.    Is it an accurate statement that,
5   with regard to Category 10, you're the most
6   knowledgeable person at Nashville Liquidators
7   or Ingram Entertainment concerning the standard
8   credit terms issued by Nashville Liquidators in
9   the 1998 to 2000 time frame?
10      A.    Well, the credit terms were
11  established by the sales reps, the president,
12  and the management of Ingram Entertainment.
13      Q.    So you might have knowledge -- if I
14  understood your testimony earlier today, you
15  might have knowledge as to what those terms
16  are, but you didn't establish them?
17      A.    That's correct.
18      Q.    And to the extent that you knew
19  about those terms, it would be from setting up
20  an account in the accounting department?
21      A.    Yes.
22      Q.    I'm going to show you a document
23  now that will be marked Exhibit 2.  And I'm
24  going to ask you if you've ever seen that
25  document before.

CERTIFICATE OF COURT REPORTER

I, Marilyn Gorski, Court Reporter and Notary Public within and for the State of Tennessee, do certify that, pursuant to agreement, there came before me STEVEN GADSEY, who was duly sworn by me to testify the truth in relation to the matters in controversy between the parties hereto; that said deposition was taken in stenotype by me at the time and place hereinbefore set forth and was thereafter reduced to typewritten form by me and that the foregoing is a true and correct transcript of my stenotype notes then and there taken.  The reading and signing of the deposition was not waived.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken, this 3rd day of August, 2005.

_____
MARILYN GORSKI, Court Reporter
Notary Public, State of Tennessee
My commission expires: 5-25-09

MORGAN REPORTING SERVICE ~ (615) 890-7317